**Ralph S. NUSBAUM, Respondent,**

v.

**COUNTY OF BLUE EARTH and State of Minnesota, Petitioners, Appellants.**

No. C3-87-338.

Supreme Court of Minnesota.

April 22, 1988.

Hubert H. Humphrey, III, Atty. Gen., Lori M. Mittag, Sp. Asst., St. Paul, for petitioners, appellants.

Bailey W. Blethen, Stephen P. Rolfsrud, Mankato, for respondent.

YETKA, Justice.

This appeal is from a decision of the court of appeals which reversed a lower court order granting summary judgment for defendant State of Minnesota. The case arose out of an automobile accident on August 2, 1983, in which plaintiff Ralph S. Nusbaum failed to negotiate a sharp curve while driving on Blue Earth County Road 48. Nusbaum brought this tort action against the State of Minnesota and Blue Earth County. Nusbaum settled with the county, but continued his action against the state, claiming it was negligent in the placement of an "END 45 MILE SPEED" sign before an unmarked curve that could not be safely negotiated at speeds in excess of 40 miles per hour.

The trial court granted the state's motion for summary judgment, holding that the state's conduct in posting regulatory signs was entitled to governmental immunity under the discretionary function exception pursuant to Minn.Stat. § 3.736, subd. 3(b) (1986). The court of appeals reversed, holding that, although signing was a discretionary act entitled to governmental immunity, such immunity did not apply where the state created a danger giving rise to a duty to warn. The court of appeals remanded for trial on the issue of whether the state had created a danger. The state then sought further review, which was granted by this court. We affirm the court of appeals, but on different grounds.

## I.

On June 9, 1981, Blue Earth County passed a resolution to request the Commissioner of the Minnesota Department of Transportation to perform a traffic investigation for purposes of authorizing a reduced speed limit on a section of County State–Aid Highway No. 48 (hereinafter CSAH 48) beginning 500 feet south of the Buckmeister Bridge and continuing north to the Saltzman Resort. This request was made pursuant to Minn.Stat. § 169.14, subd. 5 (1986), which provides:

**Zoning within local areas.** When local authorities believe that the existing speed limit upon any street or highway, or part thereof, within their respective jurisdictions and not a part of the trunk highway system is greater or less than is reasonable or safe under existing conditions, they may request the commissioner to authorize, upon the basis of an engineering and traffic investigation, the erection of appropriate signs designating what speed is reasonable and safe, and the commissioner may authorize the erection of appropriate signs designating a reasonable and safe speed limit thereat, which speed limit shall be effective when such signs are erected.[1]

Upon receipt of this request, the state conducted a traffic investigation to determine a reasonably safe speed for the specified section of CSAH 48. Jerry Miller, the local district traffic engineer assigned to the investigation, contacted Ralph Sleeper, who was the county engineer responsible for signing Blue Earth County roads. Sleeper apparently told Miller that the presence of pedestrian traffic in the area was the reason for the requested reduction in speed.

In conducting his investigation, Miller relied on the Minnesota Traffic Engineering Manual (hereinafter TEM) and the Manual on Uniform Traffic Control Devices (hereinafter MUTCD). As to speed limits, MUTCD provides:

In order to determine the proper numerical value for a speed zone on the basis of an engineering and traffic investigation the following factors should be considered:

1. Under Minn.Stat. § 160.02, subd. 9 (1986), Blue Earth County is the "Road Authority" for CSAH 48. As the road authority, Blue Earth County is responsible for placing and maintaining "such traffic-control devices upon highways under [its] jurisdiction as [it] may deem necessary to * * * regulate, warn, or guide traffic." Minn.Stat. § 169.06, subd. 3 (1986). Thus, with the exception of obtaining state authorization to change a speed limit, the county is responsible for signing county state-aid highways.

1. Road surface characteristics, shoulder condition, grade, alignment and sight distance.

2. The 85–percentile speed and pace speed.

3. Roadside development and culture, and roadside friction.

4. Safe speed for curves or hazardous locations within the zone.

5. Parking practices and pedestrian activity.

6. Reported accident experience for a recent 12–month period.

Manual on Uniform Traffic Control Devices, 2B–10.

With the aid of an assistant, Miller investigated CSAH 48 and made "test runs" at speeds of 40, 45, and 50 miles per hour. After this investigation, Miller recommended a 45 m.p.h. speed zone for the area requested and, in addition, the area continuing north to the entrance of Bray County Park. Apparently, the extension was made because of pedestrian traffic during the summer coming from Bray County Park.

On October 5, 1981, the state issued its authorization for the reduced speed zone for the section of CSAH 48 "between a point approximately 3,400 feet north of the intersection with [CSAH] 17 and a point approximately 7,600 feet south of Trunk Highway 60." The county then posted the proper signs marking the beginning and end of the speed zone authorized by the state. Prior to the placement of the signs for the 45 m.p.h. speed zone, there were no existing speed limit signs on CSAH 48. However, in the absence of a sign, the speed limit on CSAH 48 was apparently 55 miles per hour pursuant to Minn.Stat. § 169.14, subd. 1 (1982). Although MUTCD 2B–13 states that "[a]t the end of the section to which a speed limit applies, a Speed Limit sign showing the next speed limit shall be erected," no such sign was posted at the terminus of the 45-mile speed zone on CSAH 48. Instead, an "END 45 MILE SPEED" sign was erected. This was the proper procedure under MUTCD 2B–14.1, which states:

There are many secondary roads, county, township and municipal, which have been speed zoned in and on the fringes of urban districts * * * where the rural speed limit remains at that provided in the statutes and continuous speed zoning has not been warranted. In many instances the posting of the statutory speed limit to terminate the reduced speed zone would be inappropriate because the statutory limit would be misleading and encourage drivers to travel too fast for conditions. Sound engineering judgment would dictate that no numerical value should be posted and that the basic rule (Minn.Statutes 169.14 SPEED RESTRICTIONS, Subd. 1) should apply. In order to provide for the termination of the reduced speed zone without posting another numerical speed, the End (30) Mile Speed sign (R2–6) may be used.

Pursuant to the state's authorization, the "END 45 MILE SPEED" sign was placed at a point approximately 1,000 feet south of a curve, which allegedly cannot be safely negotiated at speeds in excess of 40 miles per hour. This curve, at the times relevant to this case, was apparently unmarked.

In the late evening of August 2, 1983, Ralph S. Nusbaum was driving north on CSAH 48. Nusbaum was driving about 55 miles per hour as he approached a sign indicating a 45 m.p.h. speed zone. Nusbaum slowed down to between 40 and 45 miles per hour for the speed zone and, upon seeing the "END 45 MILE SPEED" sign, began to accelerate his car to about 55 miles per hour. Nusbaum proceeded straight for a short distance and then failed to negotiate the sharp, unmarked curve to the left. Nusbaum's car left the road and went into a ditch. The accident resulted in severe injuries to Nusbaum.

Nusbaum filed suit against Blue Earth County and the State of Minnesota, claiming that defendants' negligence in signing CSAH 48 caused his injuries. Nusbaum entered into a Perringer settlement with the county, but has continued to seek additional relief against the state. The primary basis of Nusbaum's claim against the state is that it was negligent in the placement of

an "END 45 MILE SPEED" sign prior to an unmarked curve that could be negotiated safely at a speed no greater than 40 miles per hour. The state moved the district court for summary judgment on the grounds that (1) "signing" was a discretionary function entitled to immunity under Minn.Stat. § 3.736, subd. 3(b) and (2) the state owed plaintiff no duty of care.

The trial judge granted the state's motion and entered judgment dismissing the action. The trial judge ruled that Miller's decision as to where to place the "END 45 MILE SPEED" sign was a discretionary act of the type not to be reviewed by the judiciary under section 3.736, subdivision 3(b). The court stated that, although the state might lose its discretionary immunity if it had notice of a dangerous condition arising out of the sign placement, there was no issue as to notice in this case. The only evidence presented was the affidavit of Jerry Miller stating that he had no notice of complaints concerning the speed zone. Thus, the state retained its immunity and was entitled to summary judgment.

On appeal, the Minnesota Court of Appeals reversed. *Nusbaum v. Blue Earth County*, 411 N.W.2d 917 (Minn.App.1987). The court of appeals first held that the speed zone authorization by the state was "a discretionary act and entitled to discretionary immunity." *Id.* at 921. However, relying on its own recent decision in *Holmquist v. State*, 409 N.W.2d 243 (Minn.App. 1987), *rev. granted*, No. CX–86–2206 (Sept. 23, 1987), the court apparently determined that the discretionary function exception was inapplicable if the state created a dangerous condition giving rise to a duty to warn. The court then ordered that the case be remanded for a trial on that issue. *Nusbaum*, 411 N.W.2d at 923.

The issues raised on this appeal are:

1. Was the state's action in posting an "END 45 MILES SPEED" sign on CSAH 48 a discretionary act within the meaning of Minn.Stat. § 3.736, subd. 3(b) (1986) so as to immunize the state from tort liability?

2. Is the discretionary function exception from tort claims inapplicable where the state has created a dangerous condition giving rise to a duty to warn?

3. Did the state owe Nusbaum a duty to use reasonable care in determining whether to authorize a speed zone requested by the county?

## II.

The court of appeals determined that the signing decision for CSAH 48 was a discretionary function entitled to immunity under Minn.Stat. § 3.736, subd. 3(b) (1986). However, the court went on to hold that the discretionary function exception was inapplicable where, as here, a fact question existed as to whether the state had created a dangerous condition giving rise to a duty to warn. Thus, the case was remanded for trial.

We turn first to the issue of whether the signing decision for CSAH 48 was a discretionary function entitled to immunity. Because we find that this decision did not involve the type of discretion protected by the discretionary function exception, we do not reach the second issue of whether the exception is inapplicable where the state has created a dangerous condition.

### A.

Prior to 1976, the doctrine of sovereign immunity existed in Minnesota to prevent suit against the state without its consent. *Berman v. Minnesota State Agric. Soc'y*, 93 Minn. 125, 127, 100 N.W. 732, 732 (1904); *Sanborn v. City of Minneapolis*, 35 Minn. 314, 29 N.W. 126 (1886). However, there were several exceptions to the general rule of immunity. For example, the doctrine of sovereign immunity only applied if the governmental unit was engaged in governmental, rather than proprietary, activity. *See, e.g., Reierson v. City of Minneapolis*, 264 Minn. 153, 156, 118 N.W.2d 223, 225 (1962). *See also Susla v. State*, 311 Minn. 166, 247 N.W.2d 907 (1976). Other exceptions existed in the area of construction and maintenance of streets. *See, e.g., Anderson v. City of Minneapolis*, 296 N.W.2d 383, 387 (Minn.1980); *Paul v. Faricy*, 228 Minn. 264, 272–74, 37 N.W.2d 427, 433–34 (1949).

In *Nieting v. Blondell*, 306 Minn. 122, 235 N.W.2d 597 (1975), this court abolished the doctrine of sovereign immunity except as to "the exercise of discretionary functions or legislative, judicial, quasi-legislative, and quasi-judicial functions." *Id.* at 132, 235 N.W.2d at 603.[2] The court prospectively applied its decision to tort claims arising on or after August 1, 1976, in order to allow the legislature time to enact a tort claims act. *Id.* at 132, 235 N.W.2d at 603. The legislature responded by enacting legislation that created a general rule whereby:

> The state will pay compensation for injury to or loss of property or personal injury or death caused by an act or omission of any employee of the state while acting within the scope of office or employment * * * under circumstances where the state, if a private person, would be liable to the claimant, whether arising out of a governmental or proprietary function.

Minn.Stat. § 3.736, subd. 1 (1986). Certain exceptions to the general rule of liability were created, including the discretionary function exception.

Thus, prior to *Nieting* and the legislation governing tort claims against the state, the general rule was immunity with limited exceptions of liability. After *Nieting*, however, the general rule is now liability (if it is established under general tort principles) with limited exceptions of immunity such as where the alleged tortious conduct constitutes a discretionary function.

### B.

The discretionary function exception is simply stated in Minn.Stat. § 3.736, subd. 3(b) (1986), which precludes government liability for "[a]ny loss caused by the performance or failure to perform a discretionary duty, whether or not the discretion is abused." However, its simplicity ends abruptly, as is demonstrated by the large volume of federal and state cases on this topic.[3]

The major underpinnings for the discretionary function exception to governmental tort liability rest in the notion that the judicial branch of government should not, through the medium of tort actions, second-guess certain policy-making activities that are legislative or executive in nature. "[J]udicial review of major executive policies for 'negligence' or 'wrongfulness'" could "disrupt the balanced separation of powers of the three branches of government." Prosser and Keeton on Torts § 131 at 1039 (5th ed. 1984). *See also* Davis, Administrative Law Treatise § 27.11 at 60–22 (2d ed. 1984).[4]

Courts have consistently encountered difficulty in applying the discretionary func-

---

**2.** As a forerunner to *Nieting*, this court decided *Spanel v. Mounds View School Dist. No. 621*, 264 Minn. 279, 118 N.W.2d 795 (1962). In *Spanel*, the court prospectively abolished sovereign immunity in tort claims against school districts, municipalities, and other governmental subdivisions although not including the state. The legislature then enacted legislation making municipalities liable for torts of their employees, Minn.Stat. § 466.02 (1986), subject to numerous exceptions, including a discretionary function exception, Minn.Stat. § 466.03, subd. 6 (1986) (containing similar language to that found in Minn.Stat. § 3.736, subd. 3(b) (1986)).

**3.** The discretionary function exception is also present in the Federal Tort Claims Act, 28 U.S.C. § 2680(a) (1976), and consists of virtually identical language to that used in Minn.Stat. § 3.736, subd. 3(b) (1986).

**4.** The tort immunity of a governmental unit provided by the discretionary function excep-

tion of the state and municipal tort claims acts should be distinguished from common law immunity of a government employee. Although both are phrased in terms of whether the exercise of discretion was involved, they are based on entirely different rationales. Immunity of an employee honestly exercising discretion under common law was based in the notion that imposition of liability for an erroneous decision would inhibit decisionmaking. Thus, discretion in the context of an employee's immunity was much broader than the type of discretion referred to in the discretionary function exception applicable in actions against governmental units. As the following analysis indicates, the discretion referred to in the latter context involves a balancing of policy objections. *See Johnson v. County of Steele*, 240 Minn. 154, 164, 60 N.W.2d 32, 39 (1953); *Williamson v. Cain*, 310 Minn. 59, 245 N.W.2d 242 (1976). *Compare* Restatement (Second) of Torts § 895B (state's immunity) *with* § 895D (public officer's immunity).

tion exception. This court has recognized that "almost every act involves some measure of discretion, and yet undoubtedly not every act of government is entitled to discretionary immunity." *Cairl v. State*, 323 N.W.2d 20, 23 (Minn.1982). A common conclusion, however, is that each case must be judged in a fashion which focuses on whether the legislature intended to immunize the particular government activity that is the subject of the tort action. *See United States v. Varig Airlines*, 467 U.S. 797, 813, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984).

In applying the discretionary function exception under Minn.Stat. § 466.03, subd. 6 (1986) (actions against municipalities) and Minn.Stat. § 3.736, subd. 3(b) (1986) (actions against the state), this court has drawn a distinction between conduct at a planning level (protected) and conduct at an operational level (unprotected). For example, in *Silver v. City of Minneapolis*, 284 Minn. 266, 170 N.W.2d 206 (1969), this court determined that deployment of police forces to control civil unrest was an executive policy decision protected as a discretionary function. Subsequently, in *Hansen v. City of Saint Paul*, 298 Minn. 205, 214 N.W.2d 346 (1974), this court was again confronted with a discretionary function issue arising where city officials with knowledge of two dangerous, roaming dogs failed to capture them promptly. The court again relied on a planning-operational distinction, finding that a decision not to capture two dangerous dogs until after lunch was at an operational level and, therefore, not protected.[5]

In *Cairl*, the court was faced with the issue of whether the discretionary function exception applied to a decision by state mental health officials to release a mentally retarded youth with dangerous propensities on a temporary furlough from a men-

tal hospital. 323 N.W.2d at 22. Suit was filed against the state after the youth set a fire during his temporary release which killed one person and severely burned another. Examining the decision "in light of the planning-operational distinction," *id.* at 23, n. 2, we held that the release decision was protected by the discretionary function exception. Although we described the release decision as a professional evaluation of certain factors, the essence of our holding was based on this state's policy favoring open-door treatment of mentally ill patients. We noted that imposition of liability for releasing mental patients would substantially interfere with the execution of this open-door policy. *Id.* at 23, n. 3. Thus, the policy-based decision to release the youth was protected as discretionary. *See Wilson v. Ramacher*, 352 N.W.2d 389 (Minn.1984) (city council's decision to make land improvements was protected by the discretionary function exception because it involved planning and policy judgments qualifying as discretionary acts).

In *Cairl*, this court alluded to the imprecision of merely attaching labels such as "discretionary," "ministerial," "planning level" and "operational level" to certain conduct in a conclusory manner. 323 N.W.2d at 23, n. 2. While such labels are helpful in determining whether government action or inaction is protected under the discretionary function exception, a court should always have at the forefront the idea that the exception seeks to protect policy-based decisions and prevent the impairment of effective government. *See id.* at 23, n. 3.

Other state and federal courts addressing the discretionary function exception have also adopted the planning-operational distinction. These courts have focused on the nature of the government decision, ap-

---

**5.** In *Larson v. Indep. School Dist. No. 14*, 289 N.W.2d 112 (Minn.1979), this court again dealt with discretionary immunity. *Larson* involved an action against school officials as individuals and against the school district for which the officials worked. The school district settled with plaintiff, thus leaving only issues of the school officials' liability. In determining whether the school officials' acts were protect-

ed, this court relied on common law principles of public official immunity. The case did not involve the discretionary function exception applicable to actions against governmental units. In light of this distinction, *Larson* is of limited precedential value for the instant case, which involves a claim against the state rather than public officials. *See* n. 4, *supra*.

plying the exception only where the decision involved a balancing of policy objectives rather than merely a professional or scientific judgment. For example, in *Griffin v. United States*, 500 F.2d 1059 (3rd Cir.1974), the court stated that in order "[t]o determine the applicability of the discretionary function exception * * *, we must analyze not merely whether judgment was exercised but also whether the nature of the judgment called for policy considerations." *Id.* at 1064. *Griffin* involved a suit against the United States for its negligence in approving the use of a particular lot (Lot 56) of polio vaccine which did not meet specified regulations and ultimately caused severe injuries to plaintiff after she ingested the vaccine. Lot 56 apparently was approved for use after government inspectors used certain criteria set forth in regulations for determining whether the vaccine was safe. The court held that, although implementation of the regulation required judgment based on the safety criteria, it was professional judgment rather than "that of a policy-maker promulgating regulations by balancing competing policy considerations in determining public interest." *Id.* at 1066. The court went on to note that "[w]here the conduct of Government employees in implementing agency regulations requires only performance of scientific evaluation and not the formulation of policy, we do not believe that the conduct is immunized from judicial review as a 'discretionary function.'" *Id.* *See also Hendry v. United States*, 418 F.2d 774, 783 (2d Cir.1969) ("The fact that judgments of governmental officials occur in areas requiring professional expert evaluation does not necessarily remove those judgments from the examination of courts by classifying them as discretionary functions under the [Federal Tort Claims] Act.").

It is important to note that the regulations dealing with the polio immunization program were not challenged in *Griffin*. Such a challenge would clearly have been precluded because the development of the regulations "involv[ed] balancing of policy considerations in advancing the public interest." *Griffin*, 500 F.2d at 1064. *See*

*also Madison v. United States*, 679 F.2d 736, 739 (8th Cir.1982). Instead, the plaintiff's suit was not precluded by the discretionary function exception because it merely challenged the implementation of the regulations which did not involve policy considerations.

The distinction between policy-making decisions and scientific or professional decisions was again discussed in *Blessing v. United States*, 447 F. Supp. 1160 (E.D. Penn.1978). Following *Griffin*, the court denied the government's motion to dismiss based on the discretionary function exception. *Blessing* involved an action by injured employees against the Occupational Safety and Health Administration for negligent inspection of a private employer's premise where employees received their injuries. The court determined that the case could not be dismissed at such an early stage because additional fact situations could be developed which would preclude application of the discretionary function exception.

The court posited alternative factual situations which might be proved and which would lead to different results. First, "it might be shown that non-inspection of the allegedly defective equipment was the result of an authorized decision to limit the scope of inspections due to limitations of manpower, time or the like." *Id.* at 1178–79. Such a decision would be based on political, economic, and social policy considerations, not appropriate for judicial second-guessing. Alternatively, it might be shown that the failure to inspect was not policy-based but, instead, was "a non-policy professional matter" which could be judicially reviewed without "affect[ing] the programmatic ability of OSHA to structure its inspections according to its evaluation of the 'best course.'" *Id.* at 1185. *Blessing* reinforces the notion that determining whether the discretionary function exception applies depends on whether the challenged governmental action involves a balancing of policy with political, economic, and social considerations or, alternatively, whether it involved merely a professional or scientific judgment.

The distinction between a plaintiff challenging a policy itself (which is barred by discretionary immunity) and challenging government conduct pursuant to a policy (which may or may not be barred) was recently addressed in *Aslakson v. United States*, 790 F.2d 688 (8th Cir.1986). *Aslakson* involved a negligence action against Western Area Power Administration (hereinafter WAPA), a government agency, for its failure to maintain powerlines sufficiently elevated so as to prevent injury. Plaintiff's decedent was killed when the mast of a boat he was operating came into contact with powerlines that were approximately 27 feet above the water. Government regulations required WAPA to maintain minimum vertical clearance requirements in effect at the time the powerlines were installed unless the lines constituted a safety hazard in which case WAPA would be required to raise the lines up to minimum requirements under current standards.

Apparently, since the subject powerlines had been installed, conditions had changed such that the water level under the lines had risen. However, WAPA officials did not believe these lines constituted a hazard because of their remote location. The court rejected the government's contention that the decision of whether the lines constituted a safety hazard necessitating elevation was protected by the discretionary function exception. Instead, the court noted: "Where the challenged governmental activity involves safety considerations under an established policy rather than the balancing of competing public policy considerations, the rationale for the exception falls away and the United States will be held responsible for the negligence of its employees." *Id.* at 693. The court noted further that, although the safety policy involved some judgment, "it [was] not the kind of judgment that involves the weighing of public policy considerations." *Id.* Because the plaintiff's challenge to governmental activity did not go to the policy itself, but, instead, to the failure of WAPA officials to comply with the policy in maintaining safe powerlines, the action was not barred by the discretionary function exception.

Other state courts have also addressed discretionary immunity exceptions, which are present in state tort claims acts. In *Stevenson v. State Dept. of Transp.*, 290 Or. 3, 619 P.2d 247 (1980), plaintiff sued the State of Oregon for negligence in maintaining traffic signals at a particular intersection where plaintiff's decedents were involved in an automobile accident. Negligence was grounded in two alternative allegations: (1) that the state failed to maintain traffic signals such that green lights appeared to all directions of traffic at the same time and (2) that the state failed to place shades on traffic lights where the design of the signals was such that one direction of traffic could view the green light for cross-traffic, leading them to believe that they had a green light when, in fact, they did not. With respect to the second negligence theory, the state argued that the decision of whether or not to place shades on traffic signals was discretionary and, therefore, entitled to immunity.

In addressing this contention, the court noted the problems associated with attempting to label government acts as "planning" (protected) versus maintenance (unprotected) and chose instead to focus on whether the government decision involved a policy judgment. *Id.* at 14, 619 P.2d at 251. The court noted that non-policy judgments might involve extremely technical considerations; yet, this should not preclude courts or juries from scrutinizing such a decision given that cases with private parties often involve equally complex matters. The court concluded that there was no evidence indicating that the "employees of the highway division made any policy decision" in deciding not to place shading devices on the traffic signal involved in this case. *Id.* at 16, 619 P.2d at 254. The court added that nothing in the Uniform Traffic Control Device Manual prevented remedying the hazardous condition created by the traffic signals. *Id.* at 16, 619 P.2d at 255.

Other states are in accord. *See, e.g., State v. Webster*, 88 Nev. 690, 504 P.2d

1316 (1972) (negligence action based on failure of state to build a cattle guard on state highway at point where plaintiff's car struck a horse was not barred by discretionary function exception to Tort Claims Act); *Rogers v. State,* 51 Haw. 293, 459 P.2d 378 (1969) (decision as to what types of road signs to place and where to place them did not require evaluation of policies, but only implementation of everyday operations of government affairs; therefore, such decisions were not protected as discretionary); *State v. I'Anson,* 529 P.2d 188 (Alaska 1974) (decision as to placement of traffic signals did not involve policy decision and was, therefore, not protected as discretionary). *But see Kolitch v. Lindedahl,* 100 N.J. 485, 497 A.2d 183 (1985) (state's posting of traffic sign required judgment which constituted discretion and, therefore, was protected from tort liability).

### C.

■ The critical inquiry that emerges from our prior decisions, as well as the decisions of other state and federal courts discussed above, is whether the challenged governmental conduct involved a balancing of policy objectives. Not all acts involving the exercise of judgment by agents of the government are protected as discretionary functions. *Cairl,* 323 N.W.2d at 23. The protection afforded by the discretionary function exception does not extend to professional or scientific judgment where such judgment does not involve a balancing of policy objectives. *Blessing v. United States,* 447 F.Supp. 1160, 1185 (E.D.Pa. 1978). Instead, government conduct is protected only where the state produces evidence that the conduct was of a policy-making nature involving social, political, or economical considerations. *United States v. Varig Airlines,* 467 U.S. at 814, 104 S.Ct. at 2764 (1984).[6]

■ Analysis of the challenged conduct under the planning-operational distinction can assist in determining whether the conduct is protected by the discretionary function exception. Ordinarily, conduct at the planning level involves policy considerations and is, therefore, protected. However, on the operational level, conduct is less likely to involve policy-making decisions and will not ordinarily be protected. Nevertheless, the distinction should not be used in a conclusory manner. Rather, it should be used as a tool for focusing attention on the central inquiry of whether the challenged government conduct involved a balancing of policy objectives.

Both the trial court and the court of appeals determined that the placement of the "END 45 MILE SPEED" sign in this case was a discretionary function entitled to immunity under Minn.Stat. § 3.736, subd. 3(b) (1986). The court of appeals stated: "[T]he state authorized the speed limit signs as a result of a planning decision based on several factors, as is clearly evidenced by the MUTCD and TEM. This action was therefore a discretionary act and entitled to discretionary immunity." 411 N.W.2d at 921. Although a judgment as to the proper speed for CSAH 48 was necessary under the factors set out in MUTCD and TEM, the court of appeals appears to have ended the inquiry too soon. Under the principles discussed above, an analysis of what type of judgment was exercised is necessary. Conclusory labeling of the signing decision as "planning" is insufficient.

To decide whether the discretionary function exception applies in this case, we must identify the precise government conduct being challenged. Plaintiff essentially challenges three acts: (1) the improper placement of the "END 45 MILE SPEED" sign, (2) the failure to post a new speed limit at the end of the speed zone, and (3) the failure to recommend the placement of

---

**6.** The burden is on the state to prove that it is immune under the discretionary function exception. However, there may be cases where the challenged government conduct facially involves a balancing of policy objectives. In those cases, it may be unnecessary for the state to produce evidence of how the decision precipitating the challenged conduct was made. *See Stevenson,* 290 Or. at 16, 619 P.2d at 255. *See generally* Peck, *The Federal Tort Claims Act: A Proposed Construction of the Discretionary Function Exception,* 31 Wash.L.Rev. 207, 227 (1956).

warning signs to the county. We will address each action or omission separately.

■ First, in determining a safe speed for the speed zone requested by the county, state traffic engineers applied the six factors set forth in state policy manuals (MUTCD 2B–10). These policy-based factors leave room for judgment which is professional or scientific in nature. They do not involve formulation of public policy but, rather, implementation of established policy. If plaintiff were challenging the numerical speed limit on CSAH 48, he would not be challenging a policy decision, but rather a professional judgment based on certain factors. This would not be the type of judgment protected by discretionary immunity in the absence of any other evidence that it involved a balancing of policy objectives.

■ However, plaintiff challenges the placement of the "END 45 MILE SPEED" sign which is only tangentially related to the six factors set out in MUTCD. Nevertheless, there is no evidence that the placement of this particular sign was mandated by a policy consideration or that any policy considerations entered into the state traffic engineer's decision as to the placement of the sign. Instead, it appears that the sign was placed where it was because of the concern for pedestrian traffic, one of several factors to be considered in speed zoning. To challenge the placement of this sign does not challenge any policy itself or infringe on a regulatory agency's policy-based criteria for signing roadways. In short, there is no evidence that the "END 45 MILE SPEED" sign was placed about 1,000 feet south of a sharp curve pursuant to some broad policy decision. On the contrary, the challenge appears to be simply that the state employees did not carry out their statutory duty to determine safe speed zones on county roads when requested by the county. Because the state presented no evidence that the placement of the "END 45 MILE SPEED" sign involved a balancing of policy objectives, we hold that Nusbaum's first challenge is not barred by the discretionary function exception.

■ Analysis of Nusbaum's second challenge leads to a different result. It appears that state traffic engineers followed MUTCD 2B–13 when they did not place a new speed limit sign at the end of the speed zone. MUTCD 2B–13 states that, in conditions such as were present here, it is appropriate merely to put an "END [45] MILE SPEED" sign. The adoption by the state of MUTCD 2B–13 was a policy decision. Where the state engineers followed that policy, a challenge to their conduct is merely a challenge to the policy. Therefore, Nusbaum's claim based on failure to post a new speed limit sign is precluded because the courts or juries should not be allowed to second-guess the policy decision.

■ Nusbaum's third challenge regarding a failure to recommend the posting of warning signs is more like his first contention above. There is no evidence to indicate that the failure to suggest warning signs was based on policy considerations. Minnesota's TEM section X.A.4.d. states that traffic engineers may recommend or suggest installation of warning signs or traffic control devices by local authorities. This policy leaves room for judgment as to whether to make such recommendations. There is no evidence that any policy considerations were actually made or required in making the decision not to recommend warning signs in the instant case. Although it may be questionable whether this failure was negligent and whether it caused Nusbaum's injuries, such a claim is not precluded at the outset under the discretionary function exception because there is no evidence that any policy considerations were involved.

In sum, the court of appeals' decision that signing highways is a discretionary activity is erroneous in this case. There is no indication that the state's decision to authorize placement of the "END 45 MILE SPEED" sign about 1,000 feet south of a sharp curve on CSAH 48 involved a balancing of policy objections. Instead, it was merely a professional judgment in an attempt to establish a safe speed zone. Nusbaum's challenge of that decision does not attack the criteria set forth in MUTCD

or TEM and thus is not an attack on a state policy itself. Furthermore, there is no overriding policy consideration such as was present in *Cairl.* Therefore, we hold that the signing decision in this case did not constitute the type of discretion which entitles the state to immunity under Minn. Stat. § 3.736, subd. 3(b) (1986).[7]

## III.

The state argues that it owed plaintiff no duty and, therefore, no negligence action lies against it. Specifically, the state argues that it had no duty to extend the speed zone to include the accident curve and had no duty to inspect advisory signs outside the speed zone established by the state. The court of appeals apparently rejected the state's contention.

■ Nusbaum's response to this argument is that the state "had the duty to determine the geographical limits of the speed zone in such a way as to not create a dangerous trap for motorists proceeding with reasonable care." This response has considerable merit given that the legislature has placed the responsibility for determining reasonably safe speeds on county roads with the state Department of Transportation. Minn.Stat. § 169.14, subd. 5 (1986). Determining the boundaries of a speed zone is a necessary part of determining the reasonable and safe speed for a certain roadway requested by the county.

Although there is no express language in the statute or regulations which requires the state to investigate conditions outside the requested zone, it does not follow that a state investigator has no duty to determine the boundaries of the zone in a reasonable and safe manner. Indeed, the state admits that if it had not extended the zone's northern boundary to include the entrance to Bray Park (which was not included in the county's request), such a failure could be construed as negligence. The state appears to be concerned that if a duty

is found to exist in this case, it will necessarily "create a limitless, undefined duty on behalf of the state to sign and inspect the county road outside the speed zone for any and all purposes." Such a result would not follow, however. The extent of the duty would appear to be only that which is demanded by general tort law—the exercise of reasonable care in setting the boundaries of a speed zone. In exercising reasonable care, it might be necessary to inspect the road for a short distance outside the area requested by the county. This would not appear to place any great burden on the state investigator, as demonstrated in this case where the state investigator did, in fact, look beyond the boundaries requested by the county.

In short, we find that the state has a duty to exercise reasonable care in determining whether to authorize a speed zone. Such a duty includes the exercise of reasonable care in determining where to place signs marking the end of the speed zone. Further, Nusbaum, as a driver on CSAH 48 and a foreseeble plaintiff, was owed such a duty.

The decision of the court of appeals is affirmed, and the case is remanded for trial for the reasons set forth in this opinion.

---

7. This analysis should not be construed as a conclusion that no signing decision is a protected discretionary function. Rather, it suggests that each signing decision must be analyzed independently, keeping in mind that immunity turns on whether the decision involved policy considerations. *See Gonzales v. Hollins,* 386 N.W.2d 842 (Minn.App.1986) (decision to replace traffic lights with stop signs was part of program to save resources due to budgetary cuts; therefore, decision was based on policy considerations and was protected).