Peggy FISHER, as Trustee for the Heirs and Next of Kin of Ryan Lee Fisher, Decedent, Appellant,

v.

COUNTY OF ROCK, Respondent.

No. C6–97–2263.

Supreme Court of Minnesota.

July 15, 1999.

James E. Malters, Gordon L. Moore, III, Von Holtum, Malters & Shepherd, Worthington, for appellant.

Arvid Wendland, David Wendorf, Wendland Beattie Timmerman, Blue Earth, for respondent.

## OPINION

**PAUL H. ANDERSON, Justice.**

Peggy Fisher appeals a decision granting summary judgment in favor of respon-dent Rock County, which decision was based on the grounds that Fisher's wrongful death claim is barred by Minnesota's statute of repose for improvements to real property. Minn.Stat. § 541.051 (1998). Fisher argues that her claim is not barred because the county's failure to install approach guardrails at the bridge where her son's fatal car crash occurred falls under the maintenance exception to the statute. *See* Minn.Stat. § 541.051, subd. 1(c). The county argues that summary judgment was appropriate and further asserts that the district court should also have granted summary judgment in favor of the county based on statutory immunity. We hold that the county is entitled to statutory immunity and, therefore, we reverse the district court's denial of summary judgment on those grounds. Because we conclude the county is entitled to statutory immunity, we do not reach Fisher's argument that failure to install approach guardrails at the bridge site falls within the maintenance exception to the statute of repose.

Nineteen-year-old Ryan Lee Fisher was killed on July 24, 1996, when the car he was driving collided with the end of a bridge rail on Rock County Bridge 5857. At the time of the collision, Ryan Fisher was proceeding in a northerly direction on County State Aid Highway (CSAH) 3. A piece of the bridge railing entered the driver's side of the car, killing Ryan Fisher. Three other passengers who were in the car at the time of the collision also were injured. One of the passengers told police that the collision occurred after Ryan Fisher turned around to hand the passenger a pair of sunglasses.

Within a year after the accident, Ryan's mother, Peggy Fisher, brought a wrongful death action against the county, claiming the county negligently maintained Bridge 5857 by failing to install approach guardrails at the bridge site or adequately warn drivers that the bridge was hazardous. In response to the action, the county moved

for summary judgment, asserting that Fisher's claim was barred by Minn.Stat. § 466.03, subd. 6 (1998), statutory immunity, and by Minn.Stat. § 541.051, which imposes a 10–year statute of repose for actions arising out of improvements to real property. Fisher claimed that the county was not entitled to statutory immunity and that the county's failure to install approach guardrails at Bridge 5857 fell under the maintenance exception to the statute of repose. As a part of this lawsuit, deposition testimony was taken from, among others, two of the county's highway engineers, and affidavits were offered from one of the county's highway engineers and by both parties' highway engineering experts. The testimony and affidavits provided information about Bridge 5857, the process used by the county to determine when a bridge needs to be replaced, and the county's policies concerning bridge maintenance and replacement.

Bridge 5857 is a timber-span bridge that was built in 1939 in accordance with the engineering standards in place at that time. The bridge deck is covered with asphalt and is 55.6 feet long and 23.2 feet wide curb to curb. The bridge width includes two 11–foot–wide traffic lanes. The traffic lanes approaching the bridge from either the north or the south are also each 11 feet wide. The shoulder on either side of CSAH 3 is 3–4 feet wide, but narrower at the bridge site. Clearance on either side of the traffic lanes on the bridge deck is between 6 and 12 inches. The highway is essentially flat and straight on each side of the bridge, but there is a 42–minute angle (approximately ⅔ of one degree) in the highway approximately 200 feet north of the bridge. Fisher's highway engineering expert offered affidavit testimony in which he apparently stated that the effects of this angle are that the bridge rail is within the normal path of vehicles travelling northbound along the right side of the highway and that drivers who fail to adjust to this slight "jog" in the highway will collide with the end of the bridge rail. The county disputes this characterization

and contends that there is no such effect on northbound drivers because the highway is straight travelling in that direction until 200 yards beyond the bridge.

The bridge itself was designed with and is equipped with timber bridge rails on both sides of the bridge. The bridge rails extend the length of the bridge deck. Approach guardrails were not a part of the bridge's original design and have never been added to the bridge site. William Kline, the county's highway engineering expert, stated in his affidavit that if Bridge 5857 were to be replaced today, "it would be wider than the outside edge of the shoulders and would have approach guardrail."

Bridge 5857 was damaged in at least six separate accidents between 1980 and the time of Ryan Fisher's accident in 1996. After each accident the county repaired the damage, restoring the bridge to its as-built condition. Although the county concedes that this is an unusually high number of accidents for one bridge, county highway engineers have been unable to identify a specific reason or reasons for this sequence of events. Of the six accidents, two drivers fell asleep at the wheel, one was driving under the influence of alcohol, one was reaching for a checkbook on the floorboard, one was flipping over a cassette tape, and one swerved to avoid hitting a deer. Only one of the six accidents involved a collision with the end of the bridge rail. In the other five accidents, the vehicles collided with other parts of the bridge rail after entering the bridge deck.

While the county has never altered the bridge itself, additional signage has been placed at the bridge site. The driver of a car involved in an accident on the bridge in 1983, the third accident since 1980, stated in an affidavit that following his accident the county placed additional reflectors at the bridge ends. However, the record does not indicate whether the reflectors referred to by that driver are the four

"type three" object markers that have been located at each end of the bridge at all times material to this action. These markers are metal signs, 12 inches wide by 36 inches tall with black and yellow diagonal stripes, and are mounted on metal poles. Type three object markers are used to identify fixed objects adjacent to the roadway and are an authorized method of signage under the Minnesota Manual on Uniform Traffic Control Devices, Minnesota's guide to proper highway signage. In 1994, following the fifth accident on the bridge, the county added horizontal object markers (horizontal delineators) to each corner of the bridge. The horizontal delineators consist of 2–inch by 12–inch boards that are connected to the bridge rail ends. Photographs indicate that the horizontal delineators extend from the bridge rails at a 45–degree angle away from the highway and are approximately 8–10 feet in length. They are painted black and are diagonally striped with reflective yellow tape. Following Ryan Fisher's accident, the county placed two additional type three object markers in front of each of the four corners of the bridge.

The county is required by both state and federal law to inspect its bridges on a regular basis. The county's bridge inspector must be certified by the Minnesota Department of Transportation (MnDOT). When a bridge is inspected, the bridge inspector, using the criteria set out in MnDOT inspection manuals and reporting forms, assigns a numerical score to each of the required criteria and submits the inspection form to the MnDOT Bureau of Engineering and Operations Office of Bridges and Structures. This bureau then prepares a structure inventory form and converts the raw scores provided by the bridge inspector to a standardized score of 0–100, based on a written protocol designed by the Federal Highway Administration. This standardized score is called a sufficiency rating. The bridge is also assigned a status of "adequate" or "deficient." After Bridge 5857's regular inspection on October 18, 1995, nine months prior to Ryan Fisher's accident, its sufficiency rating was 56.2 and its status was "adequate."

Federal replacement or rehabilitation funds, as well as state highway funds, are made available to the county based on a bridge's sufficiency rating and status. To be eligible for bridge replacement funds, a bridge must be "deficient" and have a sufficiency rating of less than 50. To be eligible for bridge rehabilitation funds, a bridge must be "deficient" and have a sufficiency rating of less than 80. Eligibility of a bridge for funding does not mean that federal and state funds are automatically made available. Rather, the need to fund replacement or rehabilitation of a given bridge is compared with the need to fund replacement or rehabilitation of all other eligible bridges statewide. Only when the need for replacement or rehabilitation of a particular bridge is deemed greater than the need for replacement or rehabilitation of all other eligible bridges will federal and state funds be made available for the project. Mark Sehr, the county's highway engineer, stated in his affidavit that, in his experience, a bridge replacement project is unlikely to receive federal and state funds unless its sufficiency rating falls below 40 and its status is "deficient." Bridge 5857 is not yet eligible for federal and state bridge replacement funds. Current projections by MnDOT estimate that the bridge will be replaced in the year 2013.

After Ryan Fisher's accident, the county applied to the state for Hazard Elimination Safety (HES) Funds in order to replace Bridge 5857. HES Funds are different from the bridge replacement or rehabilitation funds described above. HES Funds are special federal funds appropriate for the elimination of identified hazardous highway situations. In its application for these funds, the county stated that the public perceived Bridge 5857 as dangerous. The county is not guaranteed to receive the applied-for HES Funds. Rather, the county's application will compete with

other projects that have been submitted throughout the state.

The Rock County Highway Department (RCHD) has 319 bridges under its jurisdiction. Of these 319 bridges, 117 are on the CSAH system. Seventy-nine of Rock County's 319 bridges, or 24.7%, have a deficient status. Six of the deficient bridges are CSAH bridges. All six have a lower sufficiency rating than Bridge 5857.[1]

A MnDOT computer printout submitted by the county reveals that, throughout Minnesota, there are 1,855 bridges having no approach guardrails where the bridge width is greater than or equal to the approaching lane surface width but less than the total of the lane surface and approaching shoulder surface width. Thirty-seven of those bridges are under the RCHD's jurisdiction and 24 of those 37 are on the CSAH system. Bridge 5857 is one of those 24 bridges.

Richard Wegner was the county's highway engineer in 1994 when the horizontal delineators were installed at the bridge site. In his deposition, Wegner testified that maintenance of a highway system means repairing that system to its as-built condition. When asked whether he ever considered installing approach guardrails at Bridge 5857, he explained that he had not and that he would not have because he believed that, from an engineering standpoint, approach guardrails could not be installed at this site. When later asked about what the cost might be of installing an approach guardrail at Bridge 5857, Wegner answered that neither the Federal Highway Administration nor the state would have participated in the cost of such a project. When asked if he ever discussed "the availability of moneys within the county for such a project on [Bridge 5857]," Wegner answered, "No. There's no availability of moneys in that county."

Fisher's attorney also questioned Wegner about the decision to place the horizon-

tal delineators at the bridge site. Wegner stated that he had made the decision to place the horizontal delineators at the site and that the decision was one he had the authority to make. Then Wegner was asked why "other alternatives were not implemented with respect to that particular bridge, such as removal of the bridge, replacement of the bridge, or redesign of the bridge[?]." Wegner replied:

> With the sufficiency rating of that bridge, the probability of having it replaced to a higher standard doesn't exist unless you can use all county money. MnDOT and the federal highways are * * * certainly not going to participate in replacing that bridge until it reaches a particular sufficiency rating. And then that bridge has to compete with all the other bridges in the state that are also competing for those same funds.

Wegner stated that a bridge's sufficiency rating determines whether a bridge will be replaced rather than repaired. When Fisher's attorney asked Wegner, "if a bridge is sufficient as far as the [sufficiency] rating goes, is that the end of the analysis from a standpoint of determining whether or not improvements or replacements should occur at that bridge," he answered, "I'd have to say yes."

Sehr, who was the county's highway engineer at the time of Ryan Fisher's accident, was also deposed and provided an affidavit. In his deposition, Sehr described his job as requiring him "to provide the safest roadway possible within [his] funding limitations." Sehr explained that he formulates a five-year construction plan, which includes a bridge replacement plan, that is approved by the county board. When Ryan Fisher's accident occurred in 1996, Bridge 5857 was not scheduled for replacement on the county's five-year plan.

As to installing approach guardrails at the bridge, Sehr stated that doing so

---

1. In addition to bridges, the RCHD is responsible for 261 miles of CSAH highways, 157 miles of which do not meet current standards and could be reconstructed if funds were available, and 57 miles of county roads, none of which meet current standards.

would not be "economically feasible" because the project would involve virtually reconstructing the bridge. Over the course of his entire career, Sehr could not identify a single bridge that had met the minimum sufficiency rating, but that he believed was unsafe. He described the county's "uniform" bridge maintenance policy as follows: "when damage does occur, we do replace in kind of whatever was there with the structure."

Fisher's expert asserted that the county does not have the discretion to merely repair Bridge 5857 to its as-built condition, to "replace in kind" any damage that occurs, because standards set forth by the American Association of State Highway and Transportation Officials (AASHTO) apply to this bridge. In 1977, AASHTO promulgated the "Guide for Selecting, Locating, and Designing Traffic Barriers." Minnesota has incorporated at least some of the AASHTO guidelines into the Minnesota Road Design Manual, Minnesota's guide for proper road design. Fisher's expert claimed that the AASHTO standards apply not only to newly designed or reconstructed bridges, but also to "even older, substandard bridges which by today's standards are too narrow." Kline stated in his affidavit that the AASHTO standards are only a guide and apply only to new construction, not to older bridges that are substandard by today's engineering standards.

Fisher's expert also stated that if an older, substandard bridge presents a hazardous condition, then as a matter of proper bridge maintenance "low cost maintenance standards should be used to protect the motoring public" until the bridge can be replaced. According to the expert, an effective approach guardrail could be installed at the bridge site for a cost of between $5,000 and $10,000. According to Kline and Sehr, however, installing an approach guardrail system at the bridge site would create an even greater hazard to motorists than the existing bridge because such a system would be weak due to deterioration of the bridge and could pose an even greater road hazard by propelling a motorist who collides with the approach guardrail into oncoming traffic or by failing structurally and then guiding a car into the creekbed below.

The district court, following the submission of documents and statements supporting and opposing the county's motion for summary judgment, denied the county's motion for summary judgment based on statutory immunity, but granted summary judgment in favor of the county on grounds that Fisher's claim is barred by Minn.Stat. § 541.051. The Minnesota Court of Appeals affirmed as to the statute of repose and did not reach the issue of statutory immunity. Fisher appeals, arguing that her wrongful death action is not barred by Minn.Stat. § 541.051. She asserts that the county's failure to install approach guardrails at the bridge site falls under the maintenance exception to the statute, which exception encompasses the county's ongoing statutory, constitutional, and common law duty to maintain its highways for the safety of the travelling public. The county argues that summary judgment was appropriate and further that the district court erred when it denied the county's motion for summary judgment based on statutory immunity.

■ Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990). On appeal, we must determine whether the district court erred in its application of the law and whether any genuine issues of material fact remain. *Offerdahl v. University of Minn. Hosps. & Clinics,* 426 N.W.2d 425, 427 (Minn.1988). In so doing, all evidence must be viewed in the light most favorable to the nonmoving party. *Delgado v. Lohmar,* 289 N.W.2d 479, 483 (Minn.1979).

■ Under the Minnesota Tort Claims Act, a county is generally "subject to liabil-

ity for its torts and those of its officers, employees and agents acting within the scope of their employment or duties whether arising out of a governmental or proprietary function." Minn.Stat. § 466.02 (1998). However, a county enjoys what has come to be known as "statutory immunity" from tort liability for "[a]ny claim based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." Minn.Stat. § 466.03, subd. 6 (1998). A county carries the burden of showing that it is entitled to statutory immunity. *See Nusbaum v. Blue Earth County,* 422 N.W.2d 713, 722 (Minn. 1988).

■ The purpose of statutory immunity is "to preserve the separation of powers by insulating executive and legislative policy decisions from judicial review through tort actions." *Rico v. State,* 472 N.W.2d 100, 104 (Minn.1991). Pursuant to statutory immunity, a county's conduct is protected only when the county produces evidence showing that the conduct at issue was of a policy-making nature involving social, political, or economic considerations. *Nusbaum,* 422 N.W.2d at 722. In determining whether statutory immunity applies, the court must decide whether the conduct at issue involved a balancing of policy objectives. *Id.* In addition, we also consider "whether the legislature intended to immunize the particular government activity that is the subject of the tort action." *Id.* at 719 (citing *United States v. Varig Airlines,* 467 U.S. 797, 813, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984)).

■ Using this analytical framework, we have distinguished between "planning level" conduct, which is protected by immunity, and "operational level" conduct, which is not protected. *Id.* Planning level decisions involve questions of public policy—"the evaluation of factors such as the financial, political, economic, and social effects of a given plan or policy." *Holmquist v. State,* 425 N.W.2d 230, 232 (Minn. 1988). Operational level decisions, on the

other hand, concern the day-to-day operation of government. *Id.*

■ Statutory immunity does not bar an action when the conduct was merely a professional or scientific judgment. *Nusbaum,* 422 N.W.2d at 722. However, if in addition to professional or scientific judgments, policy considerations played a part in making a decision, then planning level conduct is involved and statutory immunity applies. *Steinke v. City of Andover,* 525 N.W.2d 173, 176 (Minn.1994). For example, in *Nusbaum,* we held that a state engineer's failure to recommend to local officials the posting of warning signs at a particular site was not protected by the statutory immunity exception because the record contained no evidence indicating that the failure to recommend posting the warning signs was based on policy considerations. *Nusbaum,* 422 N.W.2d at 723. Rather, the record indicated that the state engineer's decision was based solely on his professional judgment. *Id.* Based on that determination, we concluded that summary judgment in favor of the county should not have been granted. *Id.* at 723–24.

In *Steinke,* on the other hand, we held that a county was entitled to statutory immunity for its decision to limit placement of warning signs to county roads and recognized right-of-ways. *Steinke,* 525 N.W.2d at 176. Specifically, we concluded that the county's decision "involved more than a professional or scientific judgment." *Id.* The county also considered policy issues, including "safety issues, financial burdens, and the possible legal consequences" of the decision. *Id.* The scope of our present inquiry was specifically set forth in *Watson by Hanson v. Metropolitan Transit Comm'n,* 553 N.W.2d 406 (Minn.1996), where we said:

"Until people carry out a governmental policy, by doing or not doing something, the policy is a dead letter. [Statutory immunity] would afford little comfort if it did not extend to some of the consequences of the policy itself. Whether

certain consequences are immune depend * * * on whether the consequential conduct itself involves the balancing of public policy consideration[s] in the formulation of policy."

*Id.* at 413 (quoting *Pletan v. Gaines,* 494 N.W.2d 38, 44 (Minn.1992)).

■ In this case, Fisher argues that the county's failure to install approach guardrails at Bridge 5857 is not protected by statutory immunity because the county engineers decided not to install the guardrails based on their professional judgment as to proper engineering standards, not as a matter of policy where options were weighed based on different policy-based criteria. In support of her position, Fisher cites the deposition of county highway engineer Wegner, where Wegner stated that he never considered installing approach guardrails at the bridge site because he did not believe it feasible from an engineering standpoint to do so.

The county, however, argues that its decision not to install approach guardrails at the bridge site was made pursuant to the county's policy of maintaining a bridge in its as-built condition until federal and state funds are made available to replace the bridge. In support of its argument, the county offers the statement of Wegner that he believed the cost of installing the guardrails would equal or exceed the cost of replacing the bridge and that, on that basis, the installation of guardrails would be economically prohibitive in light of the county's bridge replacement policy. The record indicates that Wegner did not believe the funds necessary to install approach guardrails would be available even if they had considered installing them. The county also points to Sehr's affidavit, where he stated that the cost of rehabilitating the bridge so that approach guardrails were incorporated into the design would equal or exceed the cost of replacing the bridge. Sehr stated that this rehabilitation was not undertaken "because [the][c]ounty did not have sufficient resources to do so and at the same time

replace bridges which had lower sufficiency ratings and complete other necessary highway projects."

Wegner testified that a highway system is maintained by repairing it to its as-built condition. Sehr testified that, similarly, the policy in the county is to maintain bridges in their as-built condition until federal and state bridge replacement funds become available. Sehr also stated that such funds are made available only when a bridge's sufficiency rating falls below a certain numerical score and other bridge projects statewide do not present greater needs for the available funds. Under the county's policy, which seeks to provide the safest roadway possible within funding limitations, it is understandable why neither Wegner nor Sehr considered installing approach guardrails at Bridge 5857. Installing such guardrails at the bridge site would be inconsistent with the established policy that, until bridge replacement funds become available, a bridge is to be maintained in its as-built condition. Further, installing approach guardrails at the bridge site would require the expenditure of funds that each county engineer knew were not available.

While the decisions of the county engineers not to install or suggest the installation of guardrails at Bridge 5857 were based in part on engineering considerations, engineering considerations were not the sole reason for these decisions. Rather, like the county's decision in *Steinke* regarding placement of warning signs, the decision was based on Sehr's application of the county's bridge replacement policy, a policy that balanced roadway safety considerations and economic burdens. That the county engineers did not testify to considering, then rejecting for policy reasons, the idea of installing guardrails at the bridge site does not negate the fact that they were acting in accordance with county policy and that policy considerations dictated that approach guardrails would not be installed at

the bridge site. *See Watson by Hanson,* 553 N.W.2d at 413.

■ As to Fisher's claim that the AASHTO standards regarding the installation of guardrails apply to Bridge 5857 and that the county is required, without discretion, to comply with those standards, the standards as stated in the manual do not support this claim. In the section entitled "Application of Guide," the guide does state that it "will have applications to both new and existing roadways." American Association of State Highway and Transportation Officials, *Guide for Selecting, Locating, and Designing Traffic Barriers* 4 (1977). However, the first sentence of that section specifically states that the contents are "intended as *guidelines* for those responsible for the design, installation, and maintenance of traffic barriers." *Id.* (emphasis in original). Further, in the same section, the guide states that "[i]t is recognized that limited budgets may preclude the full implementation of these guidelines" and that the guidelines "must be considered together with social, environmental, and economic factors." *Id.* In addition, the Minnesota Road Design Manual, which contains at least some of the AASHTO standards, states:

> The Road Design Manual establishes uniform policies and procedures for Mn/DOT; it is not a legal standard. The Manual is intended to present vital engineering information normally required in the design of a highway project. However, engineering judgment must be an integral part of the design process in the application of the design criteria to individual projects.

Minnesota Department of Transportation, *Minnesota Road Design Manual* Preface (1996). Thus, we conclude that Fisher's expert's assertion that Bridge 5857, built in 1939, must comply with the AASHTO standards is without merit.

We conclude that the county's failure to install approach guardrails at Bridge 5857 was a planning-level—or a policy—decision. Accordingly, we hold that the county

is entitled to statutory immunity and that the district court erred when it denied the county's motion for summary judgment on that basis. Because we hold that the county is entitled to statutory immunity, we need not determine whether the county's failure to install approach guardrails at Bridge 5857 falls under the maintenance exception to Minnesota's statute of repose for improvements to real property.

Reversed and remanded to the district court for further proceedings consistent with this opinion.