Gerald HOLMQUIST, Respondent,

v.

STATE of Minnesota,
Petitioner, Appellant.

No. CX–86–2206.

Supreme Court of Minnesota.

June 10, 1988.

Rehearing Denied Aug. 24, 1988.

Mary Ann Bernard, Sp. Asst. Atty. Gen., St. Paul, for appellant.

Frank J. Rajkowski, Paul D. Krueger, St. Cloud, for respondent.

Thomas L. Grundhoefer, St. Paul, for amicus curiae League of Minnesota Cities.

Margaret J. Flicker, St. Paul, for amicus curiae League of Minnesota Counties.

COYNE, Justice.

Respondent Gerald Holmquist brought an action against the State of Minnesota to recover damages for injuries he received in a one-vehicle accident. Holmquist alleged that the accident was caused by the State's failure to post a warning sign informing motorists of the narrow shoulder along a stretch of a state trunk highway. Reversing summary judgment in favor of the State, the court of appeals held that the discretionary function exception of the State Tort Claims Act did not provide governmental tort immunity for failure to warn of a defect created by the State. *Holmquist v. State*, 409 N.W.2d 243, 247–48 (Minn.App.1987). While we agree that the record does not demonstrate that the

absence of a sign warning of a change in the width of the shoulder was the result of a policymaking decision protected under the discretionary function exception of the State Tort Claims Act, we reverse on other grounds.

Holmquist was driving a truck and trailer west on State Trunk Highway 95 in Benton County on a foggy night in September 1983. The injury occurred when he pulled the truck off the road and the truck rolled into the ditch.

The accident occurred approximately 800 feet west of the bridge across the St. Francis River. East of the bridge the paved shoulders of Highway 95 are four to five feet wide. West of the bridge, where the accident occurred, the paved shoulders are approximately one and one-half feet wide and the slope of the roadside ditch is steeper. No signs are posted indicating that the width of the shoulders is not the same on both sides of the bridge. State Department of Transportation (MnDOT) records indicate that the only accident recorded during the previous five years along the one-mile segment of Highway 95 west of the bridge involved a motorist's collision with an animal in a construction zone and was apparently unrelated to the change in width of the highway's shoulders.

The trial court ruled that the State's duty to maintain highways includes the duty to warn of dangerous conditions of which the State has notice. Since the condition of which the plaintiff complained had not previously caused any accident and since the plaintiff could not produce any evidence that the State had notice of a dangerous condition, the trial court granted summary judgment in favor of the State. The court of appeals reversed on the ground that a jury could find that the change in the width of the shoulder constituted a pitfall, trap, or snare, giving rise to a duty to warn. The court of appeals ruled that the discretionary function exception of the State Tort Claims Act is inapplicable to the maintenance of roads and that notice is not essential when the State created the dangerous condition. *Holmquist v. State,* 409 N.W.2d 243, 247–48 (Minn.App.1987).

Because the State contends that it is immune from liability for damages resulting from the placement of highway signs, a brief review of the State Tort Claims Act and the discretionary function exception seems appropriate. With the enactment of the State Tort Claims Act, the legislature waived the State's governmental tort immunity by agreeing to pay compensation "under circumstances where the state, if a private person, would be liable to the claimant." Act of April 20, 1976, ch. 331, § 33, 1976 Minn. Laws 1282, 1293, codified at Minn.Stat. § 3.736, subd. 1 (1982). This waiver, however, is subject to a number of limitations and exceptions. One of those exceptions is the discretionary function exception, which states that "the state and its employees are not liable for the following losses: * * * (b) Any loss caused by the performance or failure to perform a discretionary duty, whether or not the discretion is abused." Minn.Stat. § 3.736, subd. 3(b) (1982). Read literally, the discretionary function exception would preserve immunity for almost all government acts because almost everything a government employee does, from driving a snow plow to formulating toxic waste disposal regulations, involves the exercise of some discretion. We have recognized, however, that the legislature did not intend the discretionary function exception to swallow the general rule of allowing recovery for those injuries negligently inflicted in the performance of government operations. *See Cairl v. State,* 323 N.W.2d 20, 23 (Minn.1982).

Accordingly, in determining whether particular conduct is protected, we have interpreted the discretionary function exception narrowly and have focused on the purpose underlying the exception. *Nusbaum v. County of Blue Earth,* 422 N.W.2d 713 (Minn.1988). The discretionary function exception is designed to assure that the courts do not pass judgment on policy decisions entrusted to coordinate branches of government. The discretionary function exception thus addresses separation of powers concerns by preventing tort actions from becoming a vehicle for judicial interference with executive and legislative policymaking. *See generally* W. Keeton,

*Prosser & Keeton on the Law of Torts* § 131, at 1039 (5th ed. 1984); 5 K. Davis, Administrative Law Treatise § 27:11 (2d ed. 1984). The exception's application is limited to decisions which involve the balancing of competing public policy considerations.

As an aid to determining whether particular conduct is protected, we have distinguished planning level decisions from those at the operational level. *Hansen v. City of St. Paul*, 298 Minn. 205, 211–12, 214 N.W. 2d 346, 350 (1974). Planning level decisions are those involving questions of public policy, that is, the evaluation of factors such as the financial, political, economic, and social effects of a given plan or policy. Operational level decisions, on the other hand, involve decisions relating to the ordinary day-to-day operations of the government. *Swanson v. United States*, 229 F.Supp. 217, 220 (N.D.Cal.1964). *See generally* Reynolds, "The Discretionary Function Exception of the Federal Tort Claims Act," 57 Geo.L.J. 81 (1968).

In applying this distinction, the temptation to engage in a mere labeling approach must be resisted. To say that the discretionary function exception is inapplicable to any decision concerning a highway condition created by the State without regard to the nature of the decision is inconsistent with the language and structure of the State Tort Claims Act. The question is not whether the State's conduct resulted in a condition posing an unreasonable risk of harm; it is whether the conduct consisted of planning or policymaking decisions (protected) or operational level decisions (unprotected). To hold otherwise would effectively nullify the discretionary function exception because a claim of loss caused by the performance or failure to perform a discretionary duty frequently rests on an allegation that the State created a hazardous condition. *See, e.g., Wilson v. Ramacher*, 352 N.W.2d 389, 393 (Minn.1984) (decision to approve proposed development of subdivision protected even though it "created a danger" of water damage to plaintiff's property). The fundamental inquiry must be whether the challenged decision involves a policymaking decision entrusted to the political branches of government and is, therefore, to be protected from judicial second-guessing.

It is the State's position that decisions involving the signing of highways are protected planning level decisions because they involve professional evaluation of complex, competing factors. This position misconstrues the import of our decision in *Cairl v. State*, 323 N.W.2d 20 (Minn.1982) and fails to distinguish decisions which embody public policy from the professional decisions which implement those policies.

In *Cairl* this court held that the decision to release a mentally retarded and potentially dangerous youth from a state institution for a holiday home visit pursuant to an open-door treatment policy was protected by the discretionary function exception. That decision involved the professional evaluation of complex and competing factors comprising a discretionary choice between alternatives. Therefore, the State argues, the decision whether and where to post a particular highway sign should be protected because, like the decision to release a particular patient, it involves the professional evaluation of complex and competing factors.

The argument misconceives the basis of the *Cairl* decision. In *Cairl* we held that the decision to release was protected by the discretionary function exception, not simply because it involved a professional evaluation of complex and competing factors, but because the threat of liability would frustrate the State's policy of open-door treatment of the mentally ill. That is, imposition of liability would have necessarily brought into question the propriety of the open-door treatment program itself. *Cairl*, 323 N.W.2d at 23–24. *See generally* Peck, "The Federal Tort Claims Act: A Proposed Construction of the Discretionary Function Exception," 31 Wash.L.Rev. 207, 240 (1956); Van Alstyne, "Governmental Tort Liability: A Public Policy Prospectus," 10 UCLA L.Rev. 463, 530–31 (1963). That public policy decisions and the professional decisions involved in carrying out settled policies have in common the evalua-

tion of complex and competing factors cannot be gainsaid. It is, however, the evaluation and weighing of social, political, and economic considerations underlying public policy decisions, not the application of scientific and technical skills in carrying out established policy, which invokes the discretionary function exception affording governmental immunity. *See Griffin v. United States*, 500 F.2d 1059 (3d Cir.1974).[1]

In applying the planning-operational level distinction to the State's activity in the present case, then, we must be mindful that the ultimate question is whether the challenged conduct involves policymaking decisions entrusted to government agencies which the legislature intended, through the discretionary function exception, to protect from judicial second-guessing.

In accordance with the requirements of Minn.Stat. § 169.06, subd. 1 (1986), the Minnesota Commissioner of Transportation has adopted a manual, known as the Minnesota Manual on Uniform Traffic Control Devices, establishing a uniform system of traffic control devices for the streets and highways of this state.[2] The Minnesota Manual contains drawings of "SOFT SHOULDERS" signs and of "NO SHOUL-

DERS" signs designated for use in maintenance and construction zones. The Manual does not contain or in any manner refer to "NARROW SHOULDERS" signs, suggesting recognition that the width of the shoulders of a roadway is ordinarily apparent. The Minnesota Manual gives this direction with respect to the application of warning signs:

> Warning signs are used when it is deemed necessary to warn traffic of existing or potentially hazardous conditions on or adjacent to a highway or street. * * * The use of warning signs should be kept to a minimum because the unnecessary use of them to warn of conditions which are apparent tends to breed disrespect for all signs.

Minnesota Manual on Uniform Traffic Control Devices 2C–1 (1986). The Minnesota Manual recognizes, however, that "[w]arning signs other than those specified above may be required under special conditions." *Id.* at 2C–41. Thus, while the Manual permits the use of signs which are not described in the Manual, it does not contemplate the use of signs other than those specified absent special circumstances.

---

**1.** We note that the State's reliance upon the definition of discretion articulated in decisions involving tort actions against public officials is misplaced. *E.g., Wilbrecht v. Babcock*, 179 Minn. 263, 228 N.W. 916 (1930). Different purposes are served by governmental immunity, which is designed to preserve the separation of powers, and official immunity, which is primarily intended to insure that the threat of potential personal liability does not unduly inhibit the exercise of discretion required of public officials in the discharge of their duties. *See* James, "Tort Liability of Governmental Units and Their Officers," 22 U.Chi.L.Rev. 610, 640–48 (1955); W. Keeton, *Prosser & Keeton on the Law of Torts* § 131, at 1039–43, 1046–51, § 132 (5th ed. 1984). *Cf.* Restatement (Second) of Torts § 895B, D (1977) (governmental immunity, official immunity, respectively). The scope of governmental and official immunity differ as well: not infrequently a governmental entity is required to compensate for the harm done by a public official even though the official is not held personally liable. Bermann, "Integrating Governmental and Officer Tort Liability," 77 Colum.L.Rev. 1175, 1186–87 (1977). *See also* 2 F. Harper & F. James, The Law of Torts § 29.15 (1956). Given the differences in purpose and scope, it is analytically unsound to equate gov-

ernmental discretionary immunity with official discretionary immunity.

**2.** The Minnesota Manual is based on the Manual on Uniform Traffic Control Devices for Streets and Highways, approved by the Federal Highway Administrator as the national standard for all highways open to public travel in accordance with 23 U.S.C. §§ 109(d), 402(a). All amendments and addenda to the national Manual proposed for incorporation into the Minnesota Manual are submitted to the Federal Highway Administration for approval prior to adoption. Federal law requires each state to have a highway safety program approved by the Secretary of Transportation, 23 U.S.C. § 402(a), and a state's participation in federal funding of highway projects is dependent upon the state's adopting the national Manual on Uniform Traffic Control Devices or a state manual which is in substantial compliance with the national Manual. 23 U.S.C. § 109(d) (1982); 23 C.F.R. § 655, subp. F (1983). By adopting the national Manual with amendments and addenda intended to accommodate Minnesota laws and conditions, Minnesota has developed a Minnesota Manual designed to conform substantially with the national Manual.

The adoption of standards or regulations is considered a protected planning level activity because it almost inevitably requires the balancing of policy considerations. For example, in *Madison v. United States,* 679 F.2d 736, 739 (8th Cir.1982), it was held that negligence in formulating inadequate safety standards for the Department of Defense Contractors Safety Manual was not actionable under the Federal Tort Claims Act because the promulgation of the manual was a planning level activity involving the weighing of various policy considerations and, accordingly, was protected. *See also United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 819–20, 104 S.Ct. 2755, 2767–68, 81 L.Ed.2d 660 (1984) (adoption of "spot-check" system for enforcement of FAA safety regulations protected).

So, too, was the promulgation of the Minnesota Manual a planning level decision involving the weighing of various policy considerations. When he adopted the Minnesota Manual the commissioner of transportation acted pursuant to the legislative directive to adopt a manual and specifications governing the use of traffic control devices within the state. Minn.Stat. § 169.06, subd. 1 (1986). Certainly, the formulation of the Minnesota Manual entailed the evaluation of many policy considerations, such as safety, climate, driving behavior, and uniformity with other states, as well as the financial implications of compliance or nonconformity with the national Manual.

The general policy embodied in the Minnesota Manual is that no signs warning that the highway has narrow shoulders shall be posted unless special conditions are present. Implementing this policy requires the exercise of judgment; and where, as here, the implementation of a policy requires the exercise of judgment, the resulting decision may or may not be protected under the discretionary function exception. The crucial question, as always, is whether the conduct involves the balancing of public policy considerations in the formulation of policy. Sometimes the implementation of a policy itself requires policymaking. *See*

*Varig Airlines,* 467 U.S. at 819–20, 104 S.Ct. at 2767–68 (FAA's decision to adopt "spot-check" system of compliance review protected because decision involved determining the order of priority among policy objectives and then balancing those objectives against practical considerations, such as staffing and funding). More often, however, implementation simply involves applying an established policy to a particular fact situation and is, therefore, unprotected operational level conduct—albeit conduct which calls for the special knowledge and expertise of government employees and requires the exercise of professional judgment. *See Aslakson v. United States,* 790 F.2d 688, 692–94 (8th Cir.1986); *Griffin v. United States,* 500 F.2d 1059, 1066 (3d Cir.1974); *Stevenson v. State Dep't of Transp.,* 290 Or. 3, 15–16, 619 P.2d 247, 254–55 (1980). *See generally,* Harris & Schnepper, "Federal Tort Claims Act: Discretionary Function Exception Revisited," 31 U. Miami L.Rev. 161, 173–77 (1976).

■ Here, the plaintiff asserts that a special condition requires the posting of a warning sign: he contends that the bridge camouflages the change in the width of the paved shoulder from four to five feet wide east of the St. Francis River to one or one and one-half feet wide on the west side of the river, thus creating a trap, snare, or pitfall. The State has not shown, indeed it has made no attempt to show, that the absence of a warning sign at the location in question was the result of a policymaking decision within the protection of the discretionary function exception. The record tells us nothing about the nature of the condition in question relative to other segments of highway. For example, is the change in width of the shoulder at the west end of the bridge unique or commonplace? Nor has the State addressed the nature of the decision-making process. The State has argued only that the decision to post a particular highway sign, like the promulgation of standards for a uniform system of highway signs, is a discretionary function because it involves the professional evaluation of complex and competing factors.

Nevertheless, we cannot conclude that the trial court erred in granting summary judgment in favor of the State. Even if the State's conduct was not protected by the discretionary function exception, there is no causal connection between the State's alleged lack of reasonable care and the plaintiff's injury. *Cf. Chabot v. City of Sauk Rapids,* 422 N.W.2d 708 (Minn.1988) (although governmental immunity waived by procurement of liability insurance, no liability because no negligence). If it can be said that a jury could find that the change in the width of the shoulder at the west end of the bridge created a trap, snare, or pitfall, it cannot be said that that change in width was a cause of plaintiff's injury. *Cf. Zinnel v. Berghuis Constr. Co.,* 274 N.W.2d 495, 499 (Minn.1979); *Tuttle v. Wicklund,* 178 Minn. 353, 356–57, 227 N.W. 203, 204 (1929).

Plaintiff drove his truck off the road approximately 800 feet—nearly ⅙ of a mile —west of the bridge. Traps, snares, and pitfalls bespeak deceptive conditions, and whatever deceptive condition existed at the end of the bridge did not exist 800 feet west of the bridge. *Larson v. Township of New Haven,* 282 Minn. 447, 452, 165 N.W. 2d 543, 546 (1969). Any illusion that a motorist might have had when driving off the west end of the bridge that the shoulder of the highway continued to be four feet wide should have been dispelled long before the motorist travelled 800 feet by simple observation of the actual width of the shoulder. That the shoulder of the highway was at the place of the accident only 12 to 18 inches wide does not itself give rise to the duty to post a warning sign. The plaintiff conceded that had the accident occurred on the other side of the highway while he was travelling in an easterly direction, he could not have alleged that the State was negligent for failing to post a sign. It is the fact of change, camouflaged by the bridge, of which he complains. However, neither the bridge nor the change in width of the shoulder at the end of the bridge can be said to have played any part in bringing about an accident which occurred some 800 feet from the bridge.

Reversed.

POPOVICH, J., took no part in the consideration or decision of this case.