Adrian **DAHLHEIMER**, Respondent,

v.

**CITY OF DAYTON**, Appellant.

No. C8–88–2516.

Court of Appeals of Minnesota.

June 13, 1989.

Review Denied Aug. 15, 1989.

Patrick J. Neaton, Wayzata, for respondent.

Jon K. Iverson, Chadwick, Johnson & Condon, Minneapolis, for appellant.

Daniel C. Berglund, Duluth, for amicus, Minn. State Fire Chiefs Ass'n.

Thomas L. Grundhoefer, St. Paul, for amicus, League of Minnesota Cities.

Heard, considered, and decided by WOZNIAK, C.J., and FOLEY and NIERENGARTEN, JJ.

## OPINION

WOZNIAK, Chief Judge.

In November 1984, Adrian Dahlheimer commenced an action for negligent firefighting against appellant City of Dayton. A jury found the City negligent and awarded Dahlheimer $40,000.

The City appeals from the judgment and the order denying its motion for judgment notwithstanding the verdict or a new trial, arguing that the public duty doctrine and discretionary immunity insulate it from liability for the Dayton Fire Department's actions. The City also contends that its membership in the League of Minnesota Cities Insurance Trust (LMCIT) does not amount to a waiver of discretionary immunity conferred by Minn.Stat. § 466.03, subd. 6 (1988). We reverse.

## FACTS

In 1984, respondent Adrian Dahlheimer and his parents lived on a farm in Dayton, Minnesota. The barn located on the farm had two sections. The southern section

was built in 1947, and the northern section was built ten years later. The lower level of the northern section was filled with forty-year-old lumber salvaged by Dahlheimer.

At approximately 3:00 a.m. on October 24, 1984, Dahlheimer's mother reported a fire in the southern section of the barn. Dayton Volunteer Fire Department Assistant Chief Mike McAlpine, who was in the first truck to leave the station, testified that he could see the glow of the fire as he left the station. The first of three fire trucks and several firefighters arrived at approximately 3:21 a.m.

Dahlheimer and McAlpine first spoke at approximately 4:00 a.m. Dahlheimer acknowledged that the upper level of the whole barn was not salvageable, but indicated he wanted to save the lumber in the lower half of the northern section. Dahlheimer testified that when he first spoke to McAlpine, the fire had not yet reached the lumber.

At trial, a dispute arose as to McAlpine's reply to Dahlheimer's request to save the lumber. Dahlheimer testified that McAlpine told him it would be no trouble to save the wood. McAlpine testified that shortly after his arrival, he determined the structure was an entire loss. He planned to attempt to save the wood by letting the barn burn to the floor and using hoses to blow away burning hay. He told Dahlheimer the Department would do its best to save the wood. Dahlheimer contended that he made no arrangements to push dirt on the lumber because of McAlpine's statements.

State Arson Investigator George Ayshford testified that when he arrived, the inside of the barn was an inferno and there was fire burning on the stored lumber.

Dahlheimer testified that about two hours later, McAlpine again told him the firefighters would try to save the wood. Between 7:00 a.m. and 8:30 a.m., however, McAlpine decided to stop putting water on the lumber. He put the Department on standby, meaning the Department would no longer actively fight the fire but would make sure it remained under control.

All trucks and firefighters left the scene for a disputed period of time. Dahlheimer and several witnesses testified that no one fought the fire from 9:00 a.m. until 3:30 p.m. They also testified that repeated calls to the Department to return went unheeded. McAlpine, on the other hand, testified that firefighters returned to the fire after 45 minutes.

Dahlheimer testified that while the fire department was away, he and his father saved 100 planks of lumber. Eventually, the fire rekindled and destroyed the remainder of the barn and all of the lumber.

Several experts testified that McAlpine's decisions to go on standby and to leave the fire unattended were unreasonable and that the fire in the lower section could have been extinguished. The City's experts testified that McAlpine correctly decided to go on standby and to leave the scene.

### ISSUES

1. Is a municipality liable for tactical decisions made by its fire chief during a fire?

2. Does membership in the League of Minnesota Cities Insurance Trust (LMCIT) amount to a waiver of the discretionary function exception to municipal liability?

### ANALYSIS

1. Liability

When deciding issues of law, we are not bound by the trial court's conclusions and may determine the issues independently. *A.J. Chromy Construction Co. v. Commercial Mechanical Services, Inc.,* 260 N.W.2d 579, 582 (Minn.1977); *American Mutual Insurance Co. v. Honeywell, Inc.,* 422 N.W.2d 274, 275 (Minn.Ct.App. 1988), *pet. for rev. denied* (Minn. June 10, 1988). The City argues that the trial court erred by refusing to find that the City was insulated from liability as a matter of law. We agree.

a. Public Policy

Not every fact situation fits precisely into a predetermined legal formula.

Aside from the question of whether a rule of law protects the City of Dayton from liability, we note that, as a fundamental principle, a municipality cannot be held liable for failing to supply general police or fire protection. *See Biloon's Electrical Service, Inc. v. City of Wilmington,* 401 A.2d 636, 640 (Del.Super.Ct.1979), *aff'd,* 417 A.2d 371 (Del.1980). Because a municipality need not provide fire protection services, general allegations of negligent conduct by the Dayton Fire Department cannot support Dahlheimer's action for negligent firefighting. *See id.* Moreover, fire protection is a most important municipal function. We will not disrupt that function by engaging in excessive judicial intervention at the tactical level.

■ When public policy considerations significantly outweigh the value of an individual's property, exceptions to municipal liability must exist. *See id.* at 641. In this case, we focus on the significant public policy considerations associated with McAlpine's tactical decisions.

Like many smaller communities, the City of Dayton has limited firefighting resources. Several considerations therefore must be factored into every decision concerning the strategic approach to fighting a fire. Those considerations include the severity of the fire, risk to human life, dollar value of the potential loss, control of the fire, and available resources.

After surveying the fire and speaking to other firefighters, McAlpine determined the barn was a total loss. He later determined that further use of resources to extinguish the fire or save the lumber would be futile. McAlpine consequently decided to go on standby status to prevent the fire from spreading to other buildings.

It is inappropriate for a jury or court to second-guess a complicated decision made during a fire because it would submit the tactical decisions of fire chiefs to the monetary and psychological threats of litigation. Such after-the-fact scrutiny would require that courts and juries dictate firefighting strategy, the amount of equipment deployed, and services offered by municipalities. This extensive interference could undermine municipalities' willingness to provide important public services.

b. Public Duty Doctrine

■ The public duty doctrine also protects the City from liability. For over 100 years, Minnesota courts have recognized that firefighting is a general public duty, rather than a special duty owed to individuals. *See Grube v. City of St. Paul,* 34 Minn. 402, 26 N.W. 228 (1886); *Frank's Livestock & Poultry Farm, Inc. v. City of Wells,* 431 N.W.2d 574, 578 (Minn.Ct.App. 1988).

> The authorities are practically uniform to the effect that the service required of such a fire department is public service for the general welfare of the public * * *.

*Grube,* 34 Minn. at 403, 26 N.W. at 229. *See also Erickson v. Great Northern Railway Co.,* 117 Minn. 348, 351–52, 135 N.W. 1129, 1131 (1912) (fire department's protection of private property is in nature of general duty and city cannot be liable for department's negligence). We agree with the City's position that as a matter of law the trial court erred in deciding that the public duty doctrine did not apply.

Although *Grube* and *Erickson* were decided before the abrogation of sovereign immunity, the supreme court has recognized the continuing vitality of the public duty doctrine:

> [S]tatutory provisions [abolishing sovereign immunity] merely removed the defense of immunity. They did not create any new liability for a municipality. In order to recover against the city, [plaintiffs] must show a breach of some duty owed them in their individual capacities and not merely a breach of some obligation owed the general public.

*Cracraft v. City of St. Louis Park,* 279 N.W.2d 801, 803–04 (Minn.1979) (quoting *Hoffert v. Owatonna Inn Towne Motel, Inc.,* 293 Minn. 220, 222, 199 N.W.2d 158, 159–60 (1972)).

■ Dahlheimer argues that McAlpine's statements at the fire created a special duty owed to him by the city.

The distinction [between public duty and special duty] is not merely a relic of the verbiage used by courts in days of sovereign immunity. Instead, it is a corollary to a basic tenet of negligence law: general duties owed to the entire public rather than a specific class of persons cannot form the basis of a negligence action.

\*   \*   \*   \*   \*   \*

[The public duty doctrine] is neither a fiction, nor artificial, nor a relic of the days of sovereign immunity. It is a well-established principle of negligence law applicable to tort actions against individuals as well as governments.

*Cracraft*, 279 N.W.2d at 804, 806. The doctrine addresses the question of whether a duty of care exists between the municipality and the plaintiff. *Id.* at 806. The doctrine is not, as Dahlheimer claims, limited to fire inspection cases. *Id.* at 806 n. 7.

A special duty is created when:

1. the municipality had actual knowledge of a dangerous condition;
2. the injured party reasonably relied on representations and conduct of the municipality or its agents so as to forego other ways of protecting himself;
3. the duty of care was created by an ordinance or statute setting forth mandatory acts for protection of a particular class; and
4. the municipality did not exercise due care to avoid increasing the risk of harm.

*Id.* at 806–07.

The City was aware of the fire. Several experts testified that the Department failed to exercise due care by leaving the fire. Dahlheimer testified that he relied on McAlpine's statements that the Department would attempt to save his wood, thereby foregoing his own attempts to save the lumber by dumping dirt on it.

On the facts presented, however, no special duty was created. McAlpine did not guarantee the lumber would be saved, nor did he prevent Dahlheimer from pushing dirt on it. He merely told Dahlheimer that the Department would *attempt* to save the

wood. Dahlheimer's alleged reliance on those statements was not reasonable.

■ In addition, Dahlheimer argues that enactment of the Tort Liability Act codified a municipality's duty of care to private citizens, thus abrogating application of the public duty doctrine except in licensing and inspection cases. We disagree.

As the *Cracraft* court noted, the Tort Liability Act eliminated the defense of sovereign immunity. *Cracraft*, 279 N.W.2d at 803–04 (quoting *Hoffert*, 293 Minn. at 222, 199 N.W.2d at 159–60). The Act did not create new causes of action and sets forth no mandatory actions designed to protect a particular class. Given the inherently public nature of firefighting and the absence of a special duty in this case, the City of Dayton cannot be liable for negligent firefighting.

c. Discretionary Function Exception

■ Municipal liability under the Tort Liability Act is limited by several exceptions. Minn.Stat. § 466.03 (1988). The discretionary function exception protects performance or failure to perform a discretionary function or duty. Minn.Stat. § 466.03, subd. 6 (1988).

In applying the discretionary function exception, the supreme court has traditionally based its decisions on the distinction between conduct at the planning level and at the operational level. Decisions made at the planning level are immune from liability while decisions made at the operational level are not. *Nusbaum v. Blue Earth Co.*, 422 N.W.2d 713, 719 (Minn.1988).

Recently, however, the supreme court has focused on the policymaking aspects of a municipality's conduct rather than attempting to pigeonhole the conduct into operational or planning categories. *See Holmquist v. State*, 425 N.W.2d 230 (Minn. 1988); *see also Biloon's*, 401 A.2d at 643 (characterizing the planning/operational distinction as arbitrary). The City argues that McAlpine's conduct is protected by the discretionary function exception.

The discretionary function exception is designed to assure that the courts do not

pass judgment on policy decisions entrusted to coordinate branches of government. The discretionary function exception thus addresses separation of powers concerns by preventing tort actions from becoming a vehicle for judicial interference with executive and legislative policymaking.

*Holmquist,* 425 N.W.2d at 231. The fundamental inquiry is whether the challenged conduct involves a policymaking decision protected from judicial second-guessing. *Id.*

In *Cairl v. State,* 323 N.W.2d 20 (Minn. 1980), the supreme court held that the decision to release a potentially dangerous, mentally ill youth was protected by the discretionary function exception. In discussing the *Cairl* decision, the supreme court has noted that the decision to release the youth was protected not only because the decision involved a complex professional evaluation, but also because threats of liability would frustrate public policy. *Holmquist,* 425 N.W.2d at 232 (discussing *Cairl v. State,* 323 N.W.2d 20 (Minn.1980)).

The challenged decision in this case is analogous to the decision challenged in *Cairl.* Like the decision in *Cairl,* the decision here was not in itself a policymaking decision. Rather, as noted earlier, McAlpine's decision to quit fighting the fire actively was not only a tactical decision, but also a decision involving broader policy considerations such as the amount of resources available, risk to human life, and risk of the fire spreading. *See also Silver v. City of Minneapolis,* 284 Minn. 266, 170 N.W.2d 206 (1969) (in view of impending riots, the discretionary function exception protected city's decision about deployment of fire and police services). We believe decisions of this nature must be protected. We therefore hold that the discretionary function exception protected McAlpine's decision. Minn.Stat. § 466.03, subd. 6 (1988).

## 2. Waiver of Immunity

In view of our holding that the City is immune from liability, we need not address the issue of whether Minn.Stat. § 466.06 (1988) applies retroactively to shield the City from any waiver of immunity or whether the statute merely codifies prior legislative intent. Similarly, several errors assigned by the City in its motion for JNOV or a new trial need not be addressed.

## DECISION

The trial court erred in imposing liability for on-site tactical decisions of appellant's fire chief. The public duty doctrine and the discretionary function exception insulate appellant from liability.

Reversed.