*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-2012**

Barbara Kuntz,
Respondent,

vs.

Minneapolis Park and Recreation Board,
Appellant.

**Filed July 20, 2015
Reversed
Bjorkman, Judge**

Hennepin County District Court
File No. 27-CV-14-1437

Timothy S. Poeschl, Rachel T. Schromen, Hanson Lulic & Krall, LLC, Minneapolis, Minnesota (for respondent)

Ann E. Walther, Karin E. Peterson, Daniel A. Louismet, Rice, Michels & Walther, LLP, Minneapolis, Minnesota (for appellant)

Considered and decided by Stauber, Presiding Judge; Bjorkman, Judge; and Rodenberg, Judge.

**U N P U B L I S H E D   O P I N I O N**

**BJORKMAN**, Judge

Appellant challenges a denial of summary judgment, arguing that statutory immunity bars respondent's negligence action related to removal of a boulevard tree following a storm. We reverse.

## FACTS

On June 21, 2013, severe storms passed through Minneapolis, damaging a large elm tree on the boulevard in front of respondent Barbara Kuntz's home. The partially uprooted tree leaned over Kuntz's house, and she feared it would eventually fall. The tree was one of more than 3,000 damaged by these particular storms. In Kuntz's neighborhood, more than 320 trees were completely destroyed, and 305 were tipped and had to be removed.

Appellant Minneapolis Park and Recreation Board is responsible for maintaining boulevard trees, including removing storm-damaged trees. While the Park Board did not have a written protocol for responding to storm emergencies, in the aftermath of these particular storms it devised and implemented an informal emergency-response plan under which it removed, in the following priority order: (1) trees blocking emergency routes and other public rights of way; (2) trees that fell on houses; (3) structurally defective trees; and (4) tipped trees not on top of a structure and leaning trees, like the one that threatened Kuntz's home.

The Park Board logged approximately 1,300 storm-related calls between June 22 and 26. Pursuant to its emergency-response plan, the Park Board catalogued damaged trees based on these reports and then addressed them in accordance with the priority system. Park Board staff prepared a "Tree Work Request" form for each reported tree and forwarded it to the Forestry Department foreman for the district in which the tree was located. The foreman then inspected the tree and assigned a work crew to remove it in accordance with the priority system.

2

By the end of the workday on June 23, the Park Board had cleared trees from most emergency vehicle routes. On June 24, crews began removing trees that had fallen on homes. That same day, the Park Board determined that it needed to rent two cranes to remove the numerous tipped and leaning trees. The Park Board began removing trees in this priority level on June 25, and continued to do so through June 30.

Kuntz and her neighbors reported her leaning tree multiple times to the Park Board, city council members, and a state representative beginning June 22. In response to these reports, the Park Board completed a Tree Work Request form for Kuntz's address on June 25. District 2 Foreman Kevin O'Connor received the form and inspected Kuntz's tree at around 10:00 a.m. the next morning. O'Connor testified that it was apparent to him that the tree needed "to be dealt with immediately." O'Connor contacted Jeff Bean who led a crane crew that was removing trees in the area. O'Connor testified that he directed Bean to remove Kuntz's tree "as quickly as possible" once he finished the project he was working on.

Bean acknowledged that he stopped to remove several other trees on his way to Kuntz's house, consistent with his practice of removing all the tipped or downed trees on a block before moving on. By the time Bean and his crane crew arrived at Kuntz's, an approaching thunderstorm made it unsafe to work, so the crew decided to return the next morning. Later that afternoon, the tree fell on Kuntz's house.

Kuntz sued the Park Board asserting three primary theories of liability: that the Park Board staff was negligent in failing to promptly pass along her reports to the Forestry Department; that O'Connor negligently failed to classify the tree as structurally

defective, preventing it from being removed sooner; and that Bean negligently disregarded O'Connor's instructions to remove Kuntz's tree as soon as possible. The Park Board moved for summary judgment, arguing that it is entitled to statutory immunity because Kuntz challenges the Park Board's policy decisions regarding its response to the June 21 storms.[1] The district court denied the motion, concluding that statutory immunity does not apply because none of the three alleged negligent actions involved planning level decisions, but instead constituted operational level conduct. The Park Board appeals.

## D E C I S I O N

On appeal from summary judgment, we determine whether there are genuine issues of material fact and whether the district court erred in applying the law. *Watson by Hanson v. Metro. Transit Comm'n*, 553 N.W.2d 406, 411 (Minn. 1996). We view the evidence in the light most favorable to the nonmoving party. *See Gleason v. Metro. Council Transit Operations*, 582 N.W.2d 216, 217 (Minn. 1998). Whether immunity applies is a legal question, which we review de novo. *Johnson v. State*, 553 N.W.2d 40, 45 (Minn. 1996). The party asserting immunity has the burden of demonstrating entitlement to that defense. *Rehn v. Fischley*, 557 N.W.2d 328, 333 (Minn. 1997).

Statutory immunity protects governmental entities from claims based on "the performance or the failure to exercise or perform a discretionary function or duty,

---

[1] The Park Board also argued that vicarious official immunity and the public-duty doctrine barred Kuntz's suit. The district court also denied the motion on these grounds. On appeal, the Park Board only challenges the district court's ruling regarding statutory immunity.

whether or not the discretion is abused." Minn. Stat. § 466.03, subd. 6 (2014). When determining what constitutes a discretionary function, courts distinguish between "planning level" conduct, which is protected by immunity, and "operational level" conduct, which is not protected. *Conlin v. City of St. Paul*, 605 N.W.2d 396, 400 (Minn. 2000). Planning level conduct involves the evaluation of factors such as the financial, political, economic, and social impacts of a given decision. *Holmquist v. State*, 425 N.W.2d 230, 232 (Minn. 1988). In contrast, operational level conduct involves decisions relating to the ordinary day-to-day operations of the government. *Id*.

"The purpose of statutory immunity is to preserve the separation of powers by insulating executive and legislative policy decisions from judicial review through tort actions." *Fisher v. Cnty. of Rock*, 596 N.W.2d 646, 652 (Minn. 1999) (quotation omitted). While there is a "gray area" dividing protected and unprotected conduct, the fundamental concern is whether the challenged conduct involves the balancing of public policy considerations. *Conlin*, 605 N.W.2d at 400 (quotation omitted).

Kuntz asserts that her negligence allegations implicate operational level conduct that the legislature has not immunized. The Park Board argues that the district court erred by examining each purported negligent act in isolation and that the challenged conduct, as a whole, reflects the Park Board's greater emergency-response plan, the formulation and implementation of which constituted planning level conduct. We agree with the Park Board.

We begin our analysis by identifying the conduct at issue. Kuntz argues that the Park Board staff was negligent in failing to (1) record and pass along reports from the

5

public regarding her tree; (2) properly diagnose the tree as structurally defective; and (3) follow explicit orders to cut down the tree "immediately." Underlying each of these challenged actions is the assertion that the Park Board did not respond to Kuntz's numerous calls for assistance soon enough, thus failing to prevent the tree from falling on her house. But any failure by the Park Board to remove Kuntz's tree earlier flows directly from its decision to systematically remove storm-damaged trees. Accordingly, we turn to whether the Park Board's actions surrounding its emergency-response plan constitutes planning level or operational level conduct.

It is undisputed that the magnitude of the June 2013 storms was unprecedented; they prompted 1,300 calls for tree assistance. The record demonstrates that the storm-related tree damage tested the Park Board's capacity in terms of both equipment and personnel. Park Board Director of Forestry Ralph Sievert testified that in the face of this emergency, the Park Board made a conscious decision to log all reported trees and respond according to the four-tiered priority system described above. Sievert explained that this emergency-response plan deviated from the Park Board's standard procedure of addressing damaged trees in the order in which they were reported. In sum, the evidence demonstrates that the Park Board developed its emergency-response plan in response to the widespread need and limited resources available in the aftermath of the storm. It is well established that decisions of this nature, involving the strategic deployment of limited resources, are protected by statutory immunity. *Silver v. City of Minneapolis*, 284 Minn. 266, 271, 170 N.W.2d 206, 209 (1969) (concluding that decisions regarding how to most effectively deploy police officers to cope with impending riot were entitled to

statutory immunity); *see also Watson*, 553 N.W.2d at 413 (MTC's decision regarding how to deploy security resources required balancing passenger protection against limited funds available, making it protected planning level conduct). On this record, we conclude that the Park Board's development of the emergency-response plan for removing storm-damaged trees is planning level conduct.

We next consider Kuntz's argument that the implementation of the emergency-response plan by individual Park Board employees involves operational level conduct. Kuntz urges us to narrowly focus on the three distinct acts she challenges. Admittedly, the distinction between planning and operational level conduct is imprecise. *Nusbaum v. Blue Earth Cnty.*, 422 N.W.2d 713, 719 (Minn. 1988) (noting the imprecision involved in distinguishing between discretionary and operational conduct); *Holmquist*, 425 N.W.2d at 234 (acknowledging that even the implementation of a policy may involve policy-making). As a result, we must be sensitive to the fact that a challenge to the implementation of a policy may in effect represent a challenge to the policy itself.

The Minnesota Supreme Court highlighted the interconnected relationship between policy-making and policy-implementation in *Watson*, where it concluded statutory immunity barred a victimized bus passenger's claims that the Metropolitan Transit Commission (MTC) negligently failed to station security personnel on the bus and train the driver. 553 N.W.2d at 413. The supreme court determined that the MTC made protected policy decisions regarding how to deploy security personnel and train drivers, and permitting the plaintiff's negligence claims to proceed based on the implementation of those policy decisions would "amount to an attack on the policies

7

themselves." *Id.* at 414. Likewise, here it is impossible to divorce the actions of those carrying out the Park Board's emergency-response plan from the plan itself. The Park Board's decision to address trees on a systematic basis ultimately directed when the Park Board responded to Kuntz's tree. Moreover, we decline to so finely parse governmental action that we focus solely on individual actors and conduct and ignore the broader policy that dictated those actions. Doing so would effectuate the second-guessing of legislative and executive decisions that statutory immunity was enacted to prevent. *Holmquist*, 425 N.W.2d at 233 (stating that the purpose of statutory immunity is to protect government actions from "judicial second-guessing").

This approach is consistent with reasoning found in other types of immunity cases. In *Anderson v. Anoka Hennepin Indep. Sch. Dist. 11*, our supreme court extended official immunity to a shop-class teacher who performed a ministerial duty because the duty was defined by a policy "established through the exercise of discretionary judgment." 678 N.W.2d 651, 660 (Minn. 2004). The specific ministerial duty at issue in *Anderson* was a safety protocol for operating a table-saw that the school district officially adopted, and required compliance with, after weighing the merits of various other measures. *Id.* at 661. The supreme court determined that a challenge to the employee's actions in implementing the protocol constitutes a challenge to the policy and serves to discourage formal policy-making. *Id.* at 660-61. This reasoning is equally persuasive here. Each of the claimed negligent acts is based on the fact that Park Board employees removed trees from other streets, homes, and yards before they acted to remove Kuntz's tree. In all

8

respects, Kuntz challenges the way the Park Board chose to respond to the widespread storm damage after weighing various policy considerations—planning level conduct.

The danger of treading upon executive decision-making is especially evident in the context of Kuntz's insistence that the Park Board be held liable for the failure of Bean and his crane crew to remove her tree immediately, as instructed by the district foreman. While the record reflects that Bean may not have responded to his foreman's instruction as quickly as Kuntz would have liked, he was still operating within the parameters of the Park Board's emergency-response plan that dictated which trees were addressed and when. The protected planning level conduct implicated by Bean's actions not only includes the Park Board's choice not to address trees based on the timing and number of reports, but also its decisions related to when and how many cranes to rent. Here, allowing Bean's actions to serve as a basis for imposing liability when they were inextricably linked to planning level conduct would limit statutory immunity's application to only the most abstract policy level decisions that had yet to be implemented.

In sum, had the Park Board implemented a different policy for responding to storm-damaged trees, it may have removed Kuntz's tree before it fell on her home. But the Park Board may have responded even later considering the number of damaged trees and limited resources. No one can be sure. What is clear is that statutory immunity prevents courts from weighing the merits of competing needs and resources, which resolution of Kuntz's negligence action would require. On this record, we conclude that the challenged conduct at issue—the process the Park Board followed in removing storm-

damaged trees—involved planning level conduct for which the Park Board is entitled to statutory immunity.

**Reversed.**