**Keith W. HENNES, Appellant (C8–88–1690), Respondent (C9–88–1746),**

**Mary L. Stassen, Respondent,**

v.

**Margaret A. PATTERSON, Respondent,**

**State of Minnesota, Respondent (C8–88–1690), Appellant (C9–88–1746).**

Nos. C8–88–1690, C9–88–1746.

Court of Appeals of Minnesota.

July 25, 1989.
Review Denied Sept. 15, 1989.

D. Patrick McCullough, McCullough, McCullough, Dyrud & Smith, St. Paul, for Keith W. Hennes.

Alden E. Schlagel, Schlagel, Legler & Nelson, St. Paul, for Mary L. Stassen.

Victor B. Anderson, St. Paul, for Margaret A. Patterson.

Hubert H. Humphrey III, Atty. Gen., Jerome L. Getz, Sp. Asst. Atty. Gen., St. Paul, for State.

Heard, considered and decided by CRIPPEN, P.J., and NORTON and MULALLY *, JJ.

## OPINION

NORTON, Judge.

A jury awarded Keith Hennes approximately $1.5 million and Mary Stassen $95,-000 for damages which they received as a result of a car accident on December 20, 1983. The jury found the state's negligence contributed 75% to the cause of the accident, and the driver, Margaret Patterson's negligence contributed 25%. Keith Hennes appeals claiming that the limitation of damages in Minn.Stat. § 3.736, subd. 4 is unconstitutional. The State of Minnesota filed a notice of review in the Hennes case and appealed the Stassen case. The state claims that it is entitled to judgment notwithstanding the verdict (JNOV) on the basis of discretionary immunity, or on the basis of the exception from liability for ice and snow removal. The state alternatively claims that it is entitled to a new trial due

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

to improper closing arguments by opposing counsel, exclusion of jury instructions regarding reckless driving and speeding, and on evidentiary questions. We reverse.

### FACTS

Keith Hennes and Mary Stassen were two passengers in a motor vehicle being driven by Margaret Patterson. There were two other people in the car at the time of the accident, Joe Labrosse and Michelle Reis. Patterson's car was traveling in the left southbound lane of the Lafayette Bridge on December 20, 1983 shortly after midnight. The Lafayette Bridge has two speed zones in the southbound lane, a 30-mile-per-hour zone at the portion of the roadway near a merging lane on the northern part of the bridge, and a 55-mile-per-hour zone on the major portion of the bridge. No measurements were taken at the scene of the accident to determine in what speed zone the accident took place.

Patterson encountered some slippery conditions on the roadway, although the road surface was cleared of ice and snow. Just past where Interstate 94 merges into the Lafayette Bridge, Patterson lost control of her car. The car fishtailed two or three times and then spun in a counter-clockwise motion and then "rocketed" up a pile of snow packed against the guardrail, teetered for a second or two on the top of the guardrail, before plunging 50 feet to the Gillette parking lot. This is according to the testimony of Patterson, Stassen and a witness whose car was entering the Lafayette Bridge, Karen Bonniwell. Another witness who was entering the Lafayette Bridge from Interstate 94, Janet Rongitsch, said she saw the Patterson car stop by the median and back up the snowpile ramp and over the bridge.

Michelle Reis was killed. Keith Hennes suffered brain damage and is now paralyzed on his right side. Mary Stassen suffered broken ribs, a broken scapula, a punctured lung and severe damage to her left knee. The other two people in the car were also injured.

From December 13, 1983 to December 16, 1983, the Twin Cities area received approximately 13 inches of snow. On December 17 and 18 (Saturday and Sunday), there was no snow, and only a trace of snow on Monday, December 19. By December 16, 1983, all the roads in the transportation district which includes the Lafayette Bridge, were plowed and cleared of ice and snow on the traveled portion of the road. Crews had worked four twelve-hour days in a row. The Twin Cities had a snow depth on the ground of approximately 13–18 inches. Due to the heavy snowfall, the snow on the bridge was pushed to the top of the guardrail on the right side of the Lafayette Bridge against a Jersey barrier (J barrier), a concrete barrier with a J contour.

The Jersey barrier is designed to deflect vehicles which strike it back into the traveled surface of the roadway. The median is also composed of a J barrier. There is a small amount of storage space between the white fog line at the right edge of the southbound lane and the edge of the right guardrail J barrier. There is no storage space between the median J barrier and the left white fog line in the left lane. Wayne Murphy, a highway engineer with the Minnesota Department of Transportation (MNDOT), stated that the compaction of the snow against the guardrail destroys the function of the guardrail.

The MNDOT maintenance personnel who plow the bridge are instructed to plow snow only to the right. No snow is to be stored against the center median. The snow must be plowed as far as possible to the right without pushing it over the top of the J barrier. The snow is not allowed to be pushed over the top of the barrier because it may strike people or cars in a parking lot below, or fall into the river, violating Minnesota Pollution Control Agency regulations.

When the snow reaches three-quarters to the top of the guardrail, the sub-area foreman schedules to have the snow removed. Specialized equipment must be used to remove the snow accumulated along the guardrail from the bridge. A snow thrower called a "snow-go" is the key element of the operation. There are only two snow-

goes in the district and none in the Lafayette Bridge subdistrict. The snow-go is first used during heavy snowfall situations to clear drifts from rural roads, before it is used to remove piles of snow accumulated along bridges. David Hastay, the sub-area foreman, does not schedule the removal of accumulated snow if there is a 30% chance of snow, because all workers and equipment must first be used to clear the traveled portions of the road. It takes approximately 20 workers and 6–12 tandem axle dumptrucks to clear the bridge. Several workers must walk outside to clear debris from the snow pile. It takes 24 hours to line up the equipment and workers for the removal. It takes six hours to remove the snowbanks from one side of the bridge. The operation of clearing the Lafayette Bridge is not conducted until after 7:00 p.m., because one lane is blocked and snow may be blown into the open lane.

David Hastay had requested that the snowbank on the bridge be removed prior to December 13. However, because of the snowfall which occurred from December 13–16, all MNDOT crews were fully occupied removing the snow from the traveled portion of the roads, and clearing sight distances. No snow was removed from the shoulders of the roads in the district during this time. The snow was not removed from the Lafayette Bridge on Saturday or Sunday, December 17 or 18, because of the district policy that MNDOT maintenance crews are not to work on weekends unless it is necessary to plow snow from the traveled portion of the roadways, or to sand or salt hazardous conditions on traveled portions of the roadway. The snowbank was not cleared from the Lafayette Bridge on Monday, December 19, because of a district policy that little outside work would be done due to the cold weather. (The high of the day for December 19 was −11° and the low was −22°). The snow against the guardrail was removed the following night when the temperature was −2° and rose to 6° above zero.

The plaintiffs called several snowplow operators who testified about their normal plowing procedures. The snowplow operators testified that they were given wide latitude as to how to plow snow. It was their decision whether or not to plow one width or two widths of snow against the bridge guardrail. It was also the snowplow operator's decision on how high to plow the snow up against the guardrail. Snowplow operators did not recognize this piling of snow against the guardrail as a hazardous condition. However, the people in the supervisory levels did recognize the ramping effect of snow against the guardrail as a hazardous condition.

By special verdict, the jury found that the state was negligent in plowing the snow against the guardrail and/or allowing the snowbank to remain against the guardrail. The jury also found that Patterson was negligent in driving. The state's negligence contributed 75% to the accident and Patterson's negligence contributed 25% to the accident. Hennes was awarded $1.5 million in past and future damages; Stassen was awarded $95,000. The trial court denied the state's motion for JNOV or new trial.

## ISSUE

Did the trial court err in denying the state's motion for JNOV on the basis of the discretionary function exception to liability, and under the exception for removal of ice and snow?

## ANALYSIS

The state contends that it is entitled to JNOV, claiming that its actions were immune from liability pursuant to Minn.Stat. § 3.736, subds. 3(b) and (d) (1982). This section provides that the state and its employees are not liable for the following losses:

(b) any loss caused by the performance or failure to perform a discretionary duty, whether or not the discretion is abused;

\* \* \* \* \* \*

(d) any loss caused by snow or ice conditions on any highway or other public place, except when the condition is affirmatively caused by the *negligent* acts of a state employee.

*Id.* (emphasis added). We believe the issue of discretionary immunity can be resolved under two recent supreme court cases, *Holmquist v. State of Minnesota*, 425 N.W.2d 230 (Minn.1988) and *Nusbaum v. County of Blue Earth*, 422 N.W.2d 713 (Minn.1988).

The discretionary function exception is to be interpreted narrowly and the court should focus on the purpose underlying the exception. *Holmquist*, 425 N.W.2d at 231. The discretionary function exception is designed to assure that the courts do not pass judgment on policy decisions entrusted to coordinate branches of government. *Id.* The exception's application is limited to decisions which involve the balancing of competing public policy considerations. *Id.* at 232. As an aid to determining whether particular conduct is protected the courts have distinguished planning level decisions from those at the operational level. "Planning level decisions are those involving questions of public policy, that is, the evaluation of factors such as the financial, political, economic, and social effects of a given plan or policy." *Id.* Operational level decisions "involve decisions relating to the ordinary day-to-day operations of the government." *Id.* The court must avoid a mere labeling approach of the function. *Id.*

Hennes claims that the state is not immune from liability in this case, because the state created the snowbank along the guardrail. Hennes' argument is based on this court's decision in *Robinson v. Hollatz*, 374 N.W.2d 300 (Minn.Ct.App.1985). In *Robinson*, this court held that the act of plowing snow is an operational function and ministerial in nature, because "whether or not the snow is actually kept away from the median is the result of the decision making process of each driver at the operational level." *Id.* at 303. This court further held that where an artificial accumulation of snow is due to an affirmative act of the government, the government "should have a duty to remove dangerous obstructions or conditions which it affirmatively created." *Id.*

However, this court's holding is severely undercut, if not impliedly overruled, by the supreme court's ruling in *Holmquist.* The supreme court held that the discretionary function exception may still apply to a hazardous highway condition created by the state.

> The question is not whether the State's conduct resulted in a condition posing an unreasonable risk of harm; it is whether the conduct consisted of planning or policy decisions (protected) or operational level decisions (unprotected). To hold otherwise would effectively nullify the discretionary function exception because a claim of loss caused by the performance or failure to perform a discretionary duty frequently rests on an allegation that the State created a hazardous condition.

*Holmquist*, 425 N.W.2d at 232.

In *Holmquist*, the supreme court did not reach the issue of whether the state's conduct in not placing a warning sign on a road with a narrow shoulder was protected by the discretionary function exception. Rather, the supreme court held there was no causal connection between the state's alleged lack of reasonable care and the plaintiff's injury. *Id.* at 235. The court further stated that the implementation of a policy itself may sometimes be policymaking. *Id.* at 234.

The *Holmquist* opinion expands on the supreme court's opinion of *Nusbaum v. Blue Earth County*, 422 N.W.2d 713 (Minn.1988), where the court clarified that the discretionary function exception required a balancing of policy considerations and not just the balancing of complex or scientific judgments. In *Nusbaum*, the supreme court held that the state has the duty to exercise reasonable care in determining whether to authorize a speed zone and in determining where to place signs marking the end of the speed zone. *Id.* at 724. Determining the speed zone required professional judgment to establish a safe speed zone, and not the balancing of public policy considerations. *Id.* at 723–24.

In applying both *Nusbaum* and *Holmquist* to the present decision, we have no

choice but to reverse the trial court and grant the state judgment notwithstanding the verdict, on the basis of the discretionary function exception to liability.

The trial court denied the application of the discretionary function exception or the ice and snow removal exception to the act of plowing the snow because of this court's decision in *Robinson v. Hollatz*, 374 N.W.2d 300 (Minn.Ct.App.1985). However, as we have previously stated, the supreme court's holding in *Holmquist* undercuts the *Robinson* holding, to the extent that the state may still be entitled to discretionary immunity even if it creates a hazardous condition, so long as the complaint is actually with the policy of the state, rather than negligent implementation of that policy.

Moreover, the present case is distinguishable from *Robinson* in several respects. In the present case there is no evidence that the state negligently plowed the traveling lanes of the Lafayette Bridge. Pursuant to state policy, all snow was plowed to the right and off the traveling lanes of the road. There was no snow next to the median on the Lafayette Bridge because of the state's policy to plow the snow to the right, and additionally because there is no room next to the median to put any snow. A natural consequence of plowing the traveled portion of the road was that the newly fallen snow, and the snow previously on the bridge, created a bank of snow on the shoulder against the guardrail to the top of the guardrail. The state determined that the snowbank against the guardrail was a lesser hazard than not plowing the surface of the traveled portion of the road.

■ In the present case, there was no evidence the snowbank along the guardrail was created by a negligent act of plowing the road. The act of plowing in this case was done pursuant to a policy of plowing the snow to the right and off the traveled portion of the road, but without pushing the snow over the bridge guardrail. This policy was developed at a supervisory level and balanced competing factors of safety to the cars traveling on the Lafayette Bridge, safety to cars and people below the Lafayette Bridge, and environmental concerns of dumping snow and other debris into the Mississippi River. Accordingly, the decision to plow the snow off the traveled portion of the road and against the guardrail is immune from liability under the discretionary function exception to liability because it was done pursuant to the state's policy, and under the ice and snow removal exception to liability because there was no evidence that the snowbank was affirmatively caused by any negligent acts of a state employee.

■ The more pertinent question which we must answer is whether the state was negligent, and whether it is immune, in not removing the snowbank from the guardrail. The state claims that the discretionary function exception to liability applies because the decision not to remove the snowbank for four days was made pursuant to its policies which were based on the considerations of safety of the public, limited equipment and workers, its budget, and safety concerns for its workers. We agree with the state that its decision was immune from liability.

There was much testimony regarding the policy of prioritizing winter highway cleaning. The Department of Transportation has adopted a statewide policy that the first priority (first stage work) during a snowstorm is to clear the driving surfaces of snow, to sand and salt the driving surfaces as necessary and then to clear sight distances at intersections and ramps. The second stage tasks which do not begin until all first stage tasks are completed, include the clearing of snowbanks from bridges and from shoulders of the roadway. After a snowfall, the workers go into two work shifts, whereby all the workers work twelve hours a day. These twelve-hour-a-day shifts continue until all first stage work is complete. The state does not do second stage work on weekends because it would involve having more employees present at time and one-half pay. The Lafayette Bridge district also has a policy of doing minimal outside work in severe cold, such as −30° as it was on December 19, 1983, due to safety concerns for its work-

ers, and the fact that its equipment breaks down more frequently in extremely cold weather, thus causing delays and the need for repair of parts. The second stage removal cannot take place at the same time as first stage work because there is not enough equipment or manpower.

In the present case, the supervisors testified that they knew that the snowbank on the guardrail presented a hazard and that it is the state's policy to schedule removal of the snowbank when snow is approximately three-fourths the height of the guardrail. The snowbank had been scheduled for removal prior to December 13, however, due to the four days of snow, the bank could not be removed. Pursuant to state policy, the removal of the snowbank did not occur on the weekend because it would have required having more people working at a higher wage rate, and there was a need to rest the workers after working four twelve-hour days in a row.

None of the bridges in the district had snowbanks removed during the weekend because of the policy of not doing secondary snow removal on weekends. This policy is based on financial and safety factors which are factors to be balanced for a discretionary function exception. The state produced evidence that this is a consistent policy and the Lafayette Bridge was not an anomaly in the district. This fact distinguishes the present case from *Holmquist*, where the court noted that the record was devoid of any evidence regarding the nature of the condition of other segments of highways which may or may not have had similar conditions. *See Holmquist*, 425 N.W.2d at 234. We hold that the decision not to remove the snowbank along the bridge guardrail on the weekend was done pursuant to a policy which balanced several factors, and is therefore the type of decision which is immune from liability under the discretion function exception.

The decision not to remove the snowbank on Monday, during the day or during the night due to the excessive cold, is also protected from liability under the discretionary function exception, because it weighs competing factors of financial and safety considerations.

Although the state knew that a hazard existed, it allocated its resources of equipment and workers based on competing factors of safety of the public, safety of its workers, limitations of its budget, and availability of equipment. Our decision in this case follows this court's decision in *Wornson v. Chrysler Corporation*, 436 N.W.2d 472 (Minn.Ct.App.1989), *pet. for rev. denied* (Minn. April 26, 1989), where we held that the decision whether to install traffic signal lights is immune from liability, based on a balancing of economic resources with safety considerations, and the need for additional signals or maintenance of existing signals in other districts and other intersections. Accordingly, the state's decision in this case, in light of balancing similar competing factors, is also immune from liability.

Because we have determined that the state is immune from liability, we need not reach the other issues raised on appeal.

### DECISION

The decision of the trial court is reversed and judgment notwithstanding the verdict is granted to the state.

Reversed.