Steven SCHAEFFER, Trustee for the surviving next of kin of Judy Ann Perry, deceased; and Steven Schaeffer, Trustee for the surviving next of kin of Dr. David John Perry, deceased, Respondent,

v.

STATE of Minnesota, et al., Appellants,

Norwest Capital Management and Trust Company, North Dakota, personal representative of the Estate of Dr. David John Perry, Chrysler Motors Corporation, Respondents.

No. C9–89–1028.

Court of Appeals of Minnesota.

Sept. 5, 1989.

Galen J. Vaa, Moorhead, for Steven Schaeffer.

Hubert H. Humphrey, III, Atty. Gen., David T. Schultz, Sp. Asst. Atty. Gen., St. Paul, Minn., Peter Kenneth Halbach, Devils Lake, N.D., for State.

Dean A. Hoistad, Scott A. Brehm, Moorhead, Minn., for Norwest Capital Management and Trust Co., North Dakota.

Gary J. Gordon, Minneapolis, for Chrysler Motors Corp.

Richard N. Jeffries, Moorhead, for Observer Francis Peterson Leasing, Inc.

Heard, considered and decided by WOZNIAK, P.J., and FORSBERG and SHORT, JJ.

## OPINION

FORSBERG, Judge.

Respondent Steven Schaeffer, as trustee for the surviving next of kin of David and

Judy Perry, sued the appellant State of Minnesota, respondent Chrysler Motors Corporation, and respondent Norwest Capital Management and Trust Company, North Dakota, personal representative of David Perry's estate. The state appeals denial of its motion for summary judgment. *See Anderson v. City of Hopkins*, 393 N.W.2d 363 (Minn.1986). We affirm.

### FACTS

On November 29, 1984, David Perry was driving a Plymouth van eastbound on Interstate 94 in Otter Tail County, Minnesota. Also in the van were his wife and two of their eight children. While approaching a bridge, the van veered to the right and went off the road, allegedly due to a faulty power steering mechanism. The van struck the end of a guardrail post, leaped onto the guardrail and rode the guardrail into a bridge pier supporting the overpass. David and Judy Perry were killed, but both children survived.

The guardrail was installed sometime between 1968 and 1971, when that section of I–94 was constructed. Originally, the guardrail was to have had a blunt end treatment. At some point, the state substituted a twisted-end guardrail design. The sole evidence submitted relating to this change in design was a "supplemental agreement" which reads in pertinent part:

> WHEREAS: The contract, among other things, provides for the construction of Structural Plate Beam Guard Rail, and
>
> WHEREAS: The State has revised its standards for the end treatment of the guard rail, and
>
> WHEREAS: These revisions have taken place since the plans for Contract No. 12996 were released, and
>
> WHEREAS: To afford greater safety to the traveling public and to avoid duplication of work and unnecessary future expense, the hereinafter described revisions shall be made.
>
> NOW, THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:
>
> 1. The Contractor shall construct the structural plate beam guard rail with twisted end sections as shown on Standard Plate No. 8319C. The Contractor herewith acknowledges receipt of a copy of said Standard Plate.

Michael Gillen, currently a highway engineer with the state, did not have personal knowledge of this specific alteration to the guardrail design, but surmised the alteration was intended to prevent vehicles from being impaled when striking a blunt end treatment.

LeRoy Delmain, District Design Engineer for the Minnesota Department of Transportation, stated that decisions concerning specific flare rates, meaning the length of the guardrail and the angle by which it flares away from the highway, are made by the project engineer. No clear evidence was presented as to who would make a decision concerning guardrail end treatment and how that decision would be made.

The design and placement of the guardrail was not changed after its original installation. Three days prior to the accident, however, the guardrail had been stiffened and reinforced by attaching additional posts behind the guardrail. The reinforcing of the guardrail was done pursuant to The Highway Safety Improvement Project, which was undertaken by the Minnesota Department of Transportation.

According to documents submitted by the state, the general purpose of highway improvement projects is to

> reduc[e] the number and severity of highway traffic accidents through engineering improvements at accident prone highway locations and/or elements. In several programs such as (1) pavement marking placement, (2) amelioration of roadside obstacles, and (3) replacement of deficient bridges, accident potential is the prime consideration in implementing appropriate safety counter measures.

To receive federal funding for such projects, the safety design standards employed must meet with the approval of the Secretary of the United States Department of Transportation. *See* 23 U.S.C.A. § 109(a), (m), (o) (West 1966 and West Supp.1989).

The Commissioner of the Minnesota Department of Transportation at the time of the 1984 improvement project, Richard Braun, stated that the authority to prepare specific detailed design of highway improvements is normally delegated to a standards engineering section of the department. Braun stated that top level management and capital expenditure decisions are greatly affected by funding constraints. He also stated that he must balance, among other things, the need for new construction against the need to reconstruct or retrofit existing highways. Although Braun gave a general overview of his department's decision-making process, he gave no explanations as to the decisions made in this particular improvement project.

After lengthy discovery, the state moved for summary judgment. In denying the motion, the trial court determined that there were a number of disputed material facts bearing upon whether or not various actions by state employees in designing, installing, and maintaining the guardrail could be considered discretionary. The trial court also determined that the motion for summary judgment was untimely because it was not served 21 days prior to the hearing as required by the Special Rules for the Seventh Judicial District. This appeal followed.

## ISSUES

1. Did the trial court err in determining the state's motion for summary judgment was untimely pursuant to local court rules?

2. Did the trial court err in determining genuine issues of material fact exist as to whether the state was protected by the doctrine of discretionary immunity?

## ANALYSIS

■ 1. Rule 15(2)(a) of the District Court Special Rules, Seventh Judicial District, states that all dispositive motions, such as motions for summary judgment, must be served 21 days prior to the hearing. In this case, the state's summary judgment motion was served only 19 days prior to the hearing.

The state's claim of immunity involves the issue of subject matter jurisdiction, which can be raised at any point in the proceedings. *See Miller v. United States,* 710 F.2d 656, 662 (10th Cir.), *cert. denied,* 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 316 (1983); Minn.R.Civ.P. 12.08(3). Even if the trial court insisted on the 21–day notice provision, it would be obliged to allow the state to renew its motion. The state's motion for summary judgment therefore cannot be denied on the basis of untimeliness.

2. The state and its employees are not liable for "a loss caused by the performance or failure to perform a discretionary duty, whether or not the discretion is abused[.]" Minn.Stat. § 3.736, subd. 3(b) (1988). In *Cairl v. State,* 323 N.W.2d 20, 23 (Minn.1982), the supreme court recognized that almost every governmental act involves some measure of discretion, but that every such act is not entitled to discretionary immunity.

■ More recently, the court distinguished between planning level decisions, which are protected, and operational level decisions, which are unprotected. *Holmquist v. State,* 425 N.W.2d 230 (Minn.1988). Planning level decisions are those which involve evaluation of such factors as financial, political, economic, and social effects of the given plan or policy. *Id.* at 232. Operational level decisions, on the other hand, are those relating to "the ordinary day-to-day operations of the government." *Id.* (citing *Swanson v. United States,* 229 F.Supp. 217, 220 (N.D.Cal.1964)). The court in *Holmquist* further explained:

It is * * * the evaluation and weighing of social, political, and economic considerations underlying public policy decisions, not the application of scientific and technical skills in carrying out established policy, which invokes the discretionary function exception affording governmental immunity.

*Id.* at 232–33.

■ Discretionary immunity is an exception to the general rule and, as such, is to be construed narrowly. *Id.* at 231. The state has the burden of proving the particu-

lar alleged conduct resulted from a broad policy decision or involved the weighing of various policy objectives. *See Nusbaum v. Blue Earth County*, 422 N.W.2d 713, 722 n. 6 (Minn.1988).

Schaeffer contends the state, acting through its employees, acted negligently during two periods of time: (1) when it installed the twisted-end guardrail between 1968 and 1971; and (2) when, over the years, it failed to remove the guardrail or alter its design to make it more safe.

*Effect of 1976 Legislation*

■ As a preliminary matter, the state seeks to limit Schaeffer's claims of negligence to the state's acts or omissions occurring on or after August 1, 1976, the effective date sovereign immunity was abolished. When enacted, Minn.Stat. § 3.736 was to apply "to claims arising from *events occurring* on or after August 1, 1976." 1976 Minn. Laws ch. 331, § 45 (emphasis added). The state claims that the original installation of the guardrail was an "event occurring" prior to August 1, 1976, and that liability cannot be premised upon this "event."

Common law sovereign immunity was abolished by the supreme court in *Nieting v. Blondell*, 306 Minn. 122, 235 N.W.2d 597 (1975). In so abolishing immunity, the court stated that its decision was applicable to *"tort claims arising* on or after August 1, 1976." *Id.* at 132, 235 N.W.2d at 603 (emphasis added). Thus, the court expressly stated the deciding factor was the date upon which the claim arose. It did not in any way suggest its decision would be inapplicable simply because the negligent act or omission occurred prior to August 1, 1976. For at least three reasons, we believe the 1976 legislature did not intend to alter the supreme court's effective date.

First, had the legislature wished to alter *Nieting*, it would have easily done so by including language to the effect that the state could not be held liable for "acts and omissions occurring prior to August 1, 1976. *See Shives v. State*, 743 S.W.2d 714, 716 (Tex.Ct.App.1987) ("acts and omissions" language in Texas statute construed to mean the state could not be held liable where its alleged negligent actions occurred prior to the effective date), *error denied* (Mar. 30, 1988).

Second, although the supreme court has not directly addressed the "events occurring" language, it has reiterated that governmental immunity has been abolished with respect to claims arising on or after August 1, 1976. *See Anderson v. City of Minneapolis*, 296 N.W.2d 383, 385 (Minn. 1980); *Miller v. Chou*, 257 N.W.2d 277, 281 (Minn.1977).

Finally, *Nieting* cited two reasons for its prospective abolishment of sovereign immunity: to give time to governmental units to procure liability insurance; and to allow governmental units to "routinely and promptly investigat[e] personal injury and other tort claims at the time of their occurrence in order that defendants may marshal and preserve whatever evidence is available for the proper conduct of their defense." *Id.*, 306 Minn. at 132, 235 N.W.2d at 603 (quoting *Spanel v. Mounds View School District No. 621*, 264 Minn. 279, 294, 118 N.W.2d 795, 804 (1962)). These two purposes are not thwarted by making the 1976 act effective as to negligent acts or omissions occurring prior to the effective date, as long as the accident or claim itself arises or occurs after August 1, 1976.

*Genuine Dispute of Material Facts*

■ Summary judgment is appropriate where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Minn.R. Civ.P. 56.03. We agree with the trial court that numerous factual disputes exist as to whether the decisions to design, install, and maintain the guardrail were planning or operational in nature.

■ As to the original installation between 1968 and 1971, there is little evidence as to why the decision was made to use the twisted-end design and no evidence as to how that decision was made. Gillen testified the decision was made on the basis of which end treatment was safer. If relative safety was the only consideration, then the decision involved professional engineer-

ing judgment and was thus operational, not policy-making. *See Abbett v. St. Louis County*, 424 N.W.2d 82, 85 (Minn.Ct.App. 1988), *pet. for rev. denied* (Minn. July 28, 1988).

Relying on the supplementary agreement which states that revision of the plans was intended to avoid unnecessary future expense, the state argues that the decision involving the guardrail design took into account financial considerations and was thus made at a planning level. It appears, however, that the state was only deciding *when* to install twisted-end treatments; it was not weighing the relative cost and safety of the twisted-end treatment against the cost and safety of other designs. In addition, even if the supplementary agreement does suggest a planning level decision, conflicting evidence suggests the original design and installation involved operational level decisions.

As to the state's failure to alter or replace the existing twisted-end treatment, the state offers evidence only as to how decisions in highway improvement projects in general are made. There is no evidence as to this specific highway improvement project, nor is there evidence as to who makes decisions about guardrail design and how those decisions are made. Although there was evidence that funding constraints would certainly be considered and would enter into the decision-making process, there is no evidence that such funding constraints led the state to decide to reinforce this guardrail rather than perform another type of safety improvement. Schaeffer claims it would have been just as expensive to alter the guardrail by burying the end in the backslope as it was to reinforce it with additional posts. If the improvements would have been equal in cost, this fact would undercut any claim that the state's decision to reinforce rather than bury the end was based on financial considerations.

█ The state claims it need only show that the alleged negligent conduct occurred in the context of a large improvement or construction project in which planning decisions were made. We disagree. Admitted-

ly, it would be unduly burdensome to require the state to document in minute detail every decision in order to prevail on a claim of discretionary immunity. Nevertheless, acceptance of the state's position would result in courts protecting the state from liability for any negligent acts committed in conjunction with a construction project, so long as the state could show that planning level decisions were made at some point in that construction project.

Case law suggests the state must be more specific in explaining its decisions if it is to prevail on a discretionary immunity claim. *See, e.g., Nusbaum*, 422 N.W.2d at 722–23 (court did not simply consider overall project as one set of related decisions, but focused on three specific decisions and determined whether each involved planning or operational level decisions); *Abbett*, 424 N.W.2d at 84–85 (failure to place particular guardrail was professional decision made at operational level and not policy-making decision protected by discretionary immunity).

In cases where discretionary immunity applied, the government was able to articulate the specific reason why a certain challenged decision was made. *See, e.g., Wornson v. Chrysler Corp.*, 436 N.W.2d 472, 474–75 (Minn.Ct.App.1989) (government established that its decision not to install specific traffic signal was arrived at after referring to statewide system of prioritizing signalization and weighing needs at particular intersection against availability of funds for entire district), *pet. for rev. denied* (Minn. Apr. 26, 1989); *Hennes v. Patterson*, 443 N.W.2d 198 (Minn.Ct.App. 1989) (JNOV granted where state established its decision not to remove snow from particular bridge was arrived at by following its established policy of snow removal prioritization, which involved weighing factors such as safety to public and state workers, and availability of equipment and funds); *cf. Gorecki v. County of Hennepin*, 443 N.W.2d 236, 241 n. 2 (Minn.Ct. App.1989) (decision not to remove snow from edge of bridge was not policy-making decision because governmental unit did not present any evidence, such as established

policy of prioritization shown in *Hennes,* explaining why snow was removed from other areas but not from edges of bridges).

We finally note that the state's reliance on cases involving suits against the United States is misplaced. Those cases involved claims against the Secretary of the United States Department of Transportation for negligently approving funding of highway projects undertaken by the states. The process by which the secretary approves funding is prescribed by statute and necessarily requires the weighing of various policy considerations. *See* 23 U.S.C.A. § 109(h) (West Supp.1989). The secretary's actions in approving funding are therefore made at the planning level and are immune from suit. *See First National Bank of Effingham v. United States,* 565 F.Supp. 119, 121–22 (S.D.Ill.1983). In contrast, the state in this case is directly involved in highway design and construction and thus engages in a number of operational level decisions.

### DECISION

The trial court's denial of the state's motion for summary judgment is affirmed.

Affirmed.