Maxine L. McEWEN, as Trustee for the Heirs of Ruth Lysford, Deceased, Appellant,

v.

BURLINGTON NORTHERN RAILROAD CO., INC., Defendant,

State of Minnesota, Estate of Hjalmer Lysford, Deceased, Respondents.

No. C5–92–1148.

Court of Appeals of Minnesota.

Jan. 5, 1993.

Review Denied Feb. 25, 1993.

Neil A. McEwen, McEwen Law Office, Thief River Falls, for appellant.

Hubert H. Humphrey, III, Atty. Gen., David T. Schultz, Sp. Asst. Atty. Gen., St. Paul, for respondent State.

Carol E. Johnson, Grand Forks, ND, for respondent Estate of Hjalmer Lysford, Deceased.

Considered and decided by RANDALL, P.J., and KALITOWSKI and DAVIES, JJ.

## OPINION

KALITOWSKI, Judge.

Appellant Maxine L. McEwen, as trustee for the heirs of Ruth Lysford, challenges the trial court's decision that her claims against respondent State of Minnesota in this wrongful death action are barred by statutory and discretionary immunity pursuant to Minn.Stat. §§ 219.402 and 3.736, subd. 3(b) (Supp.1985).

## FACTS

On the afternoon of July 5, 1986, an automobile driven by Hjalmer Lysford with

Ruth Lysford as a passenger collided with a train at a grade crossing on Trunk Highway 32 in Dugdale. Mr. and Mrs. Lysford died as a result of injuries caused by the collision.

The Dugdale crossing was a single track, mainline crossing, protected by active flashing light signals and stop signs that rotated to face traffic when the signals were activated by an approaching train. Advance warning signs were also in place 866 feet south of the crossing.

In addition to the flashing light signals, the Dugdale crossing usually exhibited a pavement marking. However, ten days before the collision, that marking was obliterated during a spot pavement overlay project. The marking was not repainted until July 9, 1986, four days after the accident.

In support of its motion for summary judgment on a claim challenging the adequacy of the warning devices, the state submitted an affidavit by an official at the Minnesota Department of Transportation (DOT). According to the affiant, the flashing light signals were installed at the Dugdale crossing in 1957 pursuant to order of the Railroad and Warehouse Commission. Since then, the crossing has not been identified as warranting evaluation for upgrading, no complaints have been filed regarding the crossing and no highway construction projects have involved the crossing. Further, the affiant asserted that in the ten years prior to this accident, there has been only one other automobile-train collision at the crossing, which resulted from the driver's admitted inattention to the flashing signals.

The state also submitted evidence that the crossing has not merited review under the state's hazard index rating (HIR) priority system. That system assigns each railroad crossing a priority number based on a formula which considers the amount of vehicular and train traffic, the number of accidents which have occurred at the crossing, and the type of warning devices already in place at the crossing. Due to the limited funds available for improving warning devices at railroad crossings, only those crossings that receive a high number under

the HIR priority system are evaluated for upgrading. At no time has the Dugdale crossing's priority number been high enough to merit review under this system.

In 1984, the DOT established a corridor review system to examine the need for railroad crossing improvements. A study of corridor 6, which includes the Dugdale crossing, determined that the flashing lights were adequate for the crossing and that gates and/or cantilevers were not necessary. In making this determination, the DOT weighed the need for gates and/or cantilevers at the crossing against the need to upgrade other crossings in this and other corridors. A 1987 review reaffirmed that gates and cantilevers were not necessary at the Dugdale crossing.

In support of its motion for summary judgment on the claim for failure to provide pavement markings in advance of the crossing, the state submitted an affidavit by a district traffic engineer for the DOT. According to the affiant, the district generally delays repainting of pavement markings obliterated during spot overlay projects "for at least a week and preferably two weeks" in order to allow the new pavement to cure. If pavement is not cured before repainting, the paint will soak into the pavement and obliterate the message, necessitating a second repainting. The affiant further states that immediate repainting of pavement markings "would double the amount of time involved in painting the messages and delay other priority painting needs along with a negative impact on already limited resources."

While the spot overlay project at the Dugdale crossing was completed on June 25, 1986, the markings were not repainted until July 9, because the painting crew was on vacation and holiday leave over the July 4 weekend. The affiant stated that the policy of scheduling vacation over the July 4 weekend allows the painting crew to work continually through the rest of the summer. He further explained that undertaking painting projects over the holiday weekend, when traffic along the highway is at its highest, would result in a greater number of accidents, increased danger to

the painting crew, and increased problems in traffic flow, and would require the hiring of extra personnel or the paying of overtime wages.

## ISSUES

1. Did the district court err in concluding the claim of inadequate warning device is barred either by statute or by discretionary immunity?

2. Did the district court err in concluding the state's decision to delay repainting the pavement marking is subject to discretionary immunity?

## ANALYSIS

■ Summary judgment is properly granted

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law.

Minn.R.Civ.P. 56.03. A governmental entity may be entitled to summary judgment if its actions are entitled to immunity. *See Ostendorf v. Kenyon*, 347 N.W.2d 834, 836 (Minn.App.1984). However, where factual disputes exist as to whether a governmental decision is entitled to immunity, summary judgment may not be appropriate. *See Schaeffer v. State*, 444 N.W.2d 876, 880 (Minn.App.1989) (denial of summary judgment affirmed when governmental entity failed to produce evidence that its decisions regarding the design, installation, and maintenance of freeway guardrail were immune).

■ In deciding whether immunity applies, this court must identify the precise governmental conduct or decision being challenged. *See Nusbaum v. County of Blue Earth*, 422 N.W.2d 713, 722 (Minn. 1988). Thus, each governmental decision or act will be examined separately to determine whether immunity applies.

### I.

■ The acts appellant challenges in her warning device claim are: (1) the maintenance of inadequate devices at the Dugdale crossing; and (2) the failure to upgrade and install crossing gates or cantilever lights at the crossing.

The first challenged act is within the plain language of Minn.Stat. § 219.402 (Supp.1985):

> Crossing safety devices or improvements installed or maintained under this chapter as approved by the board, whether by order or otherwise, are adequate and appropriate protection for the crossing.

The state established that the Dugdale crossing signals were installed in 1957 pursuant to order of the Railroad and Warehouse Commission, a predecessor to the DOT, and that subsequent reviews of the signals have determined that the signals remain adequate. Thus, under Minn.Stat. § 219.402, the Dugdale signals "are adequate and appropriate protection for the crossing."

Appellant nevertheless argues that Minn. Stat. § 219.402 does not apply here because the state violated its own standard. In support of this argument, appellant cites a 1984 corridor study which states that gates should be installed at all crossings where train speeds exceed 40 m.p.h. We do not find appellant's argument persuasive. The study merely sets out "standards" and "guidelines" to be used in selecting railroad crossings to be upgraded. It does not establish a duty to install such devices, and cannot be read to impose liability on the state for failing to immediately upgrade every crossing that falls within the description of crossings to be upgraded.

■ Appellant also challenges the state's decision not to upgrade the warning devices. The state argues this is a governmental act protected by discretionary immunity under Minn.Stat. § 3.736, subd. 3(b) (Supp.1985) (state not liable for "[a]ny loss caused by the performance or failure to perform a discretionary duty, whether or not the discretion is abused").

While almost every governmental act involves some measure of discretion, courts

have distinguished between "conduct at a planning level (protected) and conduct at an operational level (unprotected)." *Nusbaum,* 422 N.W.2d at 719. Protection does not extend to professional or scientific judgment that does not involve a balancing of policy objectives. *Id.* at 722. To establish immunity, the governmental entity must produce "evidence that the conduct was of a policy-making nature involving social, political, or economical considerations." *Id.* In this case, the state established that its decision not to upgrade the Dugdale crossing was in accordance with a priority rating system that balances financial constraints, limited funding, and safety considerations. Since the state's decision not to upgrade the Dugdale crossing involved a balancing of policy objectives, it is protected by discretionary immunity. *See Wornson v. Chrysler Corp.,* 436 N.W.2d 472, 474–75 (Minn.App.1989) (governmental decisions regarding highway traffic signals based upon prioritization system are discretionary), *pet. for rev. denied* (Minn. Apr. 26, 1989).

## II.

Appellant claims the state was negligent in failing to repaint a pavement marking at the Dugdale crossing prior to the accident. Such pavement markings are required by law. *See Minnesota Manual on Uniform Traffic Control Devices* 8B–4 (Dec. 1983) (adopted pursuant to Minn.Stat. § 169.06, subd. 1 (Supp.1985). Appellant essentially challenges two acts: (1) the failure to repaint the marking immediately after the spot overlay project was completed; and (2) the failure to repaint the marking on the tenth day after completion of the project.

■ With respect to the first alleged omission, the state established that the decision whether or not to repaint the pavement marking immediately was not left to the discretion of the individual crew. Rather, as found by the trial court, the district had a policy of delaying repainting to avoid the need for a second repainting. Thus, the decision was based upon financial considerations and is therefore protected.

■ Regarding the second alleged omission, appellant argues the state's decision to delay the repainting until after the July 4 weekend involved either implementation of a policy or the exercise of professional judgment, which are not protected activities. We disagree. The state has met its burden of showing the act was discretionary by presenting evidence that the district's policy of scheduling vacation for its painting crews over the July 4 weekend was based upon limited resources and safety concerns. Thus we conclude the decision to delay repainting of the pavement markings until after the July 4 weekend involved a balancing of policy objectives and is therefore immune from liability. *See Hennes v. Patterson,* 443 N.W.2d 198, 203–04 (Minn.App.1989) (immunity protected decision not to immediately remove snow bank along bridge guardrail which was made pursuant to prioritization policy, weighing such factors as limited resources, budget, and safety of workers and driving public), *pet. for rev. denied* (Minn.Sept. 15, 1989).

## DECISION

The trial court properly granted summary judgment to the State of Minnesota. Appellant's claims concerning the adequacy of railroad crossing warning devices were barred by Minn.Stat. § 219.402 (Supp.1985). The state was immune from liability for appellant's claims concerning upgrading the crossing and repainting pavement markings under Minn.Stat. § 3.736, subd. 3 (Supp.1985).

Affirmed.

RANDALL, Judge (concurring in part, dissenting in part).

I concur with the majority on issue one, namely appellant's claim that certain railroad crossing devices were inadequate. I agree with the majority that Minn.Stat. § 219.402 (Supp.1985) supports the trial court's dismissal.

The second issue, the question of statutory immunity, based on a claim that the state negligently delayed the repainting of pavement markings, is closer. I agree the

arguments by the state as to why they waited a certain number of days before repainting a railroad crossing warning sign which had been obliterated by freshly laid tar appear reasonable and are premised on a sensible balancing of considerations such as availability of work crews in isolated areas of the state.

However, when all is said and done, the real policy decision-making process and the conduct at the protected planning level had all been done in the past. At some point long ago in time, the decision was made to paint a pavement marking on the road leading up to the Dugdale crossing. The initial decision to paint or not paint a warning would be a type of discretionary function protected by the statute. As mentioned, however, it had been decided a long time ago to put down a warning painting, and maintain and resurface it as needed. There was no engineering report stating the pavement crossing warning should be removed. The record reflects no dispute that it had to be repainted after the road was blacktopped. The record is clear that for *previously decided safety reasons*, respondent was intent on replacing the destroyed markings with new paint.

The state knew that the paint had disappeared when they resurfaced the road, and knew that it should be and was to be repainted. The reason given for the time interval before repainting is that the asphalt repair project needs to weather a week to two weeks in order for the freshly laid pavement to cure. If not properly cured, the paint may soak into the pavement and obliterate the words, thus necessitating another painting.

The road had been resurfaced on June 25, 1986. The markings were not repainted until July 9th. The pavement may have been ready to repaint as soon as July 4th (10 days). Appellant argues it was negligence for the state to wait another five days before putting down an important warning. The fatal accident happened on

July 5th, and thus, appellant claims there is a causal relationship between the accident and the lack of the warning.

The state argues the painting crew was on vacation and holiday leave over the July 4th weekend and July 9th was its highest and best use of limited resources, citing the fact of having to hire extra personnel or pay overtime wages to have done the painting on a holiday weekend.

Although it could be argued either way, protected planning level policy making or unprotected, ministerial operational level work, I suggest it is closer to unprotected operational level conduct. There is a generally recognized distinction between planning level decisions, which are protected, and operational level decisions, which are unprotected. *Schaeffer v. State*, 444 N.W.2d 876, 879 (Minn.App.1989).

Protection *does not extend to professional or scientific judgment* which does not involve a balancing of policy objectives. *See Nusbaum v. County of Blue Earth*, 422 N.W.2d 713, 719 (Minn.1988). To establish immunity, the governmental entity must produce "evidence that the conduct was of a policy-making nature involving social, political, or economical considerations." *Id.*

The decision to wait so many days [1] before repainting fresh asphalt so that it has cured properly and will accept fresh paint seems to be nothing more than the professional or scientific judgment of someone who is familiar with the chemical makeup and physical characteristics of asphalt and of fresh paint. Elected or appointed officials discuss policy and then make protected discretionary decisions as to which road or crossing gets signals. Once those decisions are made, I suggest an engineer or foreman on the job makes the on-the-spot professional judgment as to such operational decisions as whether you use oil based paint or water based paint, or how many crew members to send, and when to send them.

---

1. *See Hansen v. City of Saint Paul*, 298 Minn. 205, 214 N.W.2d 346 (1974) (where city officials had knowledge that two dangerous dogs were loose, the decision of the dogcatchers not to capture the dogs until after lunch was at an operational level and therefore, was not protected conduct).

As the courts have stressed, the determination of what is protected discretionary governmental policy-making decisions versus unprotected decisions at the operational level is often difficult to make because so many decisions at both levels have characteristics of each type of conduct. When stripped to its essence, I suggest the decision of the painting crew as to when to repaint a warning they had been told to repaint was operational. Therefore, this claim should survive the motion for summary judgment based on the doctrine of discretionary immunity. This is not meant to cast strength on appellant's claim of negligence. Although the record before us is limited, it could well be that the decision to wait an extra three or four days was within the bounds of professional judgment. Further, the question of causation is not firm for appellant and has yet to be settled. The state's conduct will rise or fall on the factfinder's determination of negligence.

If the evidence at trial does not change, respondent may well prevail on a motion for a directed verdict on negligence and/or causation at the close of evidence. The trial court will decide that at that time. I simply suggest the label "policy" does not logically extend all the way from the top down to the most mechanical decision made by the person on the job required to do the actual work. As stated in *Nusbaum*, discretionary protection does not cover professional judgment where it does not involve the balancing of policy objectives.

I dissent on issue two and would find that appellant at least survives the motion on summary judgment on his negligence claim where summary judgment was based on the assertion of discretionary immunity. The issues of negligence and causation should move on to determination by the factfinder.